THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

DANNY LEE JONES,                )
                                )
        Petitioner,             )
                                )
    vs.                         )       No. CV01-0384-PHX-SRB
                                )
DORA B. SCHRIRO, et al.,        )       Before:     Hon. Susan R. Bolton, U.S.D.J.
                                )
        Respondents.            )
                                )

## DECLARATION OF DAVID A. RUHNKE

David A. Ruhnke hereby declares as follows, under penalties of perjury, pursuant to 28 U.S.C. § 1746:

### A.    **Background and qualifications**

My name is David A. Ruhnke. I am an attorney-at-law admitted to practice in the States of New Jersey and New York as well as numerous federal district courts, federal courts of appeals, and the United States Supreme Court. I graduated from law school in 1975 and, after an appellate clerkship, spent seven years with the Office of the Federal Public Defender for the District of New Jersey. In 1983 I went into private practice and founded the law firm that is now known as Ruhnke & Barrett. I have been a practicing attorney for 31 years and practice exclusively in the area of criminal defense. My areas of practice include state and federal trial work, state and federal appellate work, and state and federal

1

post-conviction work, including proceedings brought pursuant to 28 U.S.C. §§ 2254 and 2255.

Since entering private practice in 1983, I have devoted a substantial part of my professional life to defending capital murder cases in both state and federal courts. (A copy of a current resume, setting forth my general background and my experience in capital cases, is appended to this declaration as Exhibit A and is incorporated into this declaration by reference.) To date I have tried 14 capital cases to a verdict as lead attorney, six in the New Jersey Superior Court and eight in various United States District Courts, specifically the Southern, Eastern and Northern Districts of New York, the Middle Distrct of Pennsylvania, and the District of Massachusetts. I have successfully litigated a state post-conviction challenge to a sentence of death imposed in the New Jersey Superior Court. In addition to capital cases which actually went to trial, I have been involved in numerous other potential capital cases, as set forth in the attached resume, that were negotiated to a sentence of less than death without a trial or where, in the federal arena, the Attorney General of the United States decided not to authorize a capital prosecution. I presently represent two defendants in authorized federal capital cases that have not come to trial and I have two open pending federal capital cases that are at various stages in the federal review process.

As summarized in Attachment A, I lecture frequently on the defense of capital cases. I also regularly attend – two to three times per year – seminars and conferences on the subject of capital defense in order to stay current in this field.

2

On six prior occasions, in state and federal courts, I have been qualified to testify as an expert witness regarding attorney performance in the defense of capital cases.

**B.    Documents reviewed**

In coming to my conclusions in this case, I have reviewed a substantial quantity of materials, including all relevant trial, sentencing and post-conviction transcripts; the Arizona Supreme Court's Opinions in this matter; the pre-sentence report for the current offense; contemporaneous documentation concerning Mr. Jones' social and medical history, including his school, medical, military, criminal and incarceration records; numerous investigative reports and declarations of family members that describe Mr. Jones, his parents, and their family dynamics.  I have also reviewed the reports of Jill Miller, MSSW, and Drs. Shoba Sreenivasan, David Foy, Alan Goldberg, Pablos Stewart and Jack Potts. I have reviewed transcripts of the testimony in this proceeding of both Dr. Potts and Lee Novak, Esquire. (A complete listing  of the materials I have examined is appended to this declaration as Attachment B.)

**C.    Basis and standards for review**

I have been asked to render an opinion whether defense counsel in the trial under review in this § 2254 proceeding provided representation that complied with prevailing professional norms in the preparation and presentation of a penalty-phase case in a capital case.  Based upon on my experience and background, including regular and frequent contact with attorneys handling capital cases all around the country, I am familiar with the prevailing

3

professional norms of capital representation.  I am familiar, as well, with the Guidelines adopted by the American Bar Association (ABA) for such representation, both as originally formulated in 1989 and as updated in 2003.  Although the relevant events of this case took place in 1992-1993 and, therefore, the 1989 ABA Guidelines were in effect at that time, the 2003 revision is relevant in that it is, as noted, more of an up-date than a new summary of the responsibility of defense counsel in capital cases.  I do not view the ABA Guidelines as "aspirational," but, instead, as reflective of the level of representation that must be provided by attorneys in capital cases in order to meet prevailing professional norms.

There is, of course, no specific set of rules for judging reasonable performance.  Instead, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  However, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides." *Id.* In *Wiggins v. Smith*, 539 U.S. 510 (2003), and more recently in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), the Court has cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as a guide to "'determining what is reasonable.'" *Wiggins*, 539 U.S. at 524, quoting *Strickland*, 466 U.S. at 688. In *Wiggins*, the Court described the 1989 ABA Standards (and applied them to a case that was tried in 1989) as representing "well-defined norms . . . ." *Id.* In interpreting *Wiggins*, at least one court has explicitly concluded that the 2003 revision of those guidelines

4

should control the analysis of cases tried prior to 2003 since the 2003 Guidelines "simply explain in greater detail the 1989 Guidelines," especially in the area of "the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482, (6th Cir. 2003). In my view, the 2003 ABA Guidelines do not reflect anything new about long-established norms regarding defense counsels' obligations in a capital case. *See, e.g.*, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.REV. 299 (1983); *see also, Williams v. Taylor*, 529 U.S. 362 (2000).

In this assessment, I have also considered the "prejudice" prong of the *Strickland* inquiry, *i.e.*, whether there is a reasonable probability that, had counsel not performed deficiently, the outcome of the proceeding would have been different. The first part of the *Strickland* analysis, *i.e.*, whether a minimum standard of performance was violated, involves an objective assessment of the particular challenged facet of representation, and not an evaluation of the lawyer's general competence, professionalism, dedication, or reputation. Otherwise competent, experienced, and highly-motivated and respected attorneys can and do make mistakes which either alone or in combination may seriously undermine confidence in the verdict in a particular case. This is particularly true in capital cases, where courts have recognized that a single error or omission can amount to a denial of constitutionally adequate representation. As part of my assessment, I have tried at all times to distinguish between minimum standards of attorney performance and optimal representation. Therefore, when I express the opinion that a particular act or omission by Mr. Jones' trial counsel was

ineffective or deficient, I mean that it fell below minimum standards of attorney performance.

### D.  **Summary and Scope of Opinion**

Upon reviewing the materials described above, and considering them in light of the applicable legal standard, it is my opinion that Mr. Jones did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, based on the acts and omissions of trial counsel described in this declaration, and the likely prejudice that resulted to Mr. Jones.

The instances of deficient performance and resulting prejudice set out below do not constitute a complete list of the Sixth Amendment violations in Mr. Jones' trial or even his sentencing. I was only asked to address the ineffective assistance of counsel issues presently before the Court in this § 2254 proceeding.

### 1.  **Failure to seek, in a timely manner, the appointment of a defense mental health expert who could have evaluated whether Mr. Jones suffered from neurological disorders and organic brain dysfunction**

Following Mr. Jones' conviction, the trial court appointed Dr. Jack Potts, a psychiatrist, to prepare a mental health evaluation pursuant to Rule 26.5, Arizona Rules of Criminal Procedure. Trial counsel did not seek the appointment of a defense mental health expert, relying instead on Dr. Potts' report for mitigation at sentencing. My review of the record shows that trial counsel, even though he was relying on Dr. Potts, did not provide the information necessary to assist Dr. Potts in completing a thorough, competent, evaluation.

The record reflects that Dr. Potts conducted only two brief interviews with Mr. Jones. The first occurred on November 26, 1993 and the second on the evening before Dr. Potts

6

testified, December 7, 1993. Six days earlier, on December 1, 1993, Dr. Potts had contacted the trial court to express his concern that he had not received a complete copy of the presentence investigation report. Dr. Potts testified at the state post-conviction proceedings that once he had received the report, he found it did not meet the standards that he was used to (in a capital case) for such a report and he felt it necessary to make further inquiries.

Dr. Potts, in an effort to collect at least some social history, had himself contacted Peggy and Randy Jones, Mr. Jones' mother and stepfather. Approximately ten days prior to the aggravation/mitigation hearing, Dr. Potts conducted a brief interview of Peggy Jones and, the evening before the hearing itself, Randy Jones. Each interview lasted about an hour. Dr. Potts also spoke to Peggy Jones for about five minutes the day he testified. In his report of December 3, 1993, Dr. Potts set forth the information he reviewed prior to completing his evaluation of Mr. Jones. The list includes medical records from the Nevada Mental Health Institute and letters from various treatment facilities. A few days prior to the hearing, but after Dr. Potts had submitted his report to the trial court for consideration, trial counsel provided Dr. Potts with a transcript of the testimony of Dr. Lisa Sparks, an addictionologist who testified during the guilt phase, and records from Washoe Medical Center. This was the extent of the information provided to Dr. Potts.

When Dr. Potts testified, he asserted that Mr. Jones had suffered some significant trauma to his head over the years, and that in order to do a complete evaluation, further tests needed to be conducted. Dr. Potts stressed that given Mr. Jones' history of head trauma, he

7

may suffer from traumatic brain injury.  In addition, Dr. Potts indicated that he had found evidence of organic neurologic dysfunctions.

Dr. Potts also testified regarding some aspects of Mr. Jones' abusive childhood. Dr. Potts addressed the impact of abuse and neglect on a child in general, and, in particular, with regard to Mr. Jones.  Dr. Potts also addressed Mr. Jones' "genetic loading" for both substance abuse and affective disorder.  Finally, Dr. Potts also concluded that Mr. Jones may have suffered from a major mental illness such as cyclothymia.

It was Dr. Potts' view that additional testing and evaluation should have been performed and such evidence presented at the time of trial. It was Dr. Pott's view that such testing was likely to have shed significant light on Mr. Jones' history of abuse (physical, sexual and mental), developmental history, history of significant head injury and trauma, long term poly-substance and alcohol addiction and abuse, neurological deficits and injuries, and cognitive dysfunction and impairment.

As demonstrated by the significant and extensive evidence in mitigation uncovered by habeas counsel, it would appear that Dr. Potts merely scratched the surface.  Trial counsel's failure to seek a defense mental health expert to present all available evidence in mitigation is the essence of ineffective assistance of counsel in the capital context.   In *Rompilla*, for example, the attorneys in that case did present a substantial case in mitigation. The problem in that case, however, was what the attorneys had *failed* to discover.  The same was true in *Williams v. Taylor*, *supra*, and *Wiggins*.

8

While of course every case is different, based on my experience defending capital cases, I believe the mitigation actually presented at Mr. Jones' trial was the result of an incomplete investigation and was woefully inadequate, especially in light of the highly aggravated circumstances of this case.

2.     **Failure to seek, in a timely manner, neurological and neuropsychological testing to provide mitigation at sentencing**

Because of his failure to conduct a thorough or competent investigation, trial counsel failed to discover and, therefore, to present significant evidence of Mr. Jones' abusive early childhood, long term poly-substance and alcohol addiction and abuse, history of head injuries and trauma, and the effects, individually and cumulatively, of all these factors on his behavior before, during and after the offense. Trial counsel had but a cursory appreciation of the degree to which his client was impaired and that he suffered from several disorders, including Organic Brain Damage, Post Traumatic Stress Disorder, Poly-substance Abuse, Attention-Deficit/Hyperactivity Disorder and Mood Disorder, Not Otherwise Specified. A competent capital defense attorney is well educated in potential mitigation, especially in the area of organic mental disorders which support a mitigating factor of impaired capacity. Trial counsel's failure to recognize the need to develop competent and concrete medical and neuropsychological evidence to support a claim of significant impairment at the time of the crimes falls below the standard of care required of capital litigators.

Had trial counsel recognized the need for a neuropsychological expert, he could have requested a timely appointment and the mitigation information would have been presented to the trial court. Trial counsel's "explanation" at the PCR hearings for his untimely request for the appointment of a defense expert who could evaluate Mr. Jones for neurological damage is a virtual admission of sub-par performance. Having failed to conduct an adequate investigation of Mr. Jones' background, Mr. Novak was never in a position to appreciate or

10

recognize the necessity for a neurological examination.  One of the things that makes death-penalty litigation different is the necessity for defense counsel to be aware of the role that mental health can play in a wide variety of circumstances in the defense of a capital case. In failing to appreciate the need for such an examination, until a too-little-too-late motion to continue the penalty proceedings for such an evaluation to be performed, defense counsel fell well below prevailing professional norms.  To put the matter plainly, competent capital-defense counsel performing within the range of expected professional norms would have known better and acted on that knowledge in a timely manner.

> **3.    Failure to substantiate claimed mitigation based on Mr. Jones' traumatic birth, abusive early childhood, history of drug abuse, head injuries and the effects thereof on his behavior**

The task of defending a capital case, and preparing a case in mitigation, is unfamiliar to most courts and most attorneys, no matter how experienced in the area of criminal law. In the 1983 law review article cited *supra*, Professor Goodpaster discussed the role of the advocate in a death-penalty case in the following terms:

> As an advocate, . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

11

58 N.Y.U.L.REV. at 318.   In his article, the author also outlined the steps an attorney handling a capital case should follow, including the absolute duty of trial counsel "to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses" noting further that, "The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized." *Id.* at 324.   In describing the nature of such an investigation, Professor Goodpaster emphasized both its difficulty and time-consuming nature:

> Such investigations present more obstacles than those conducted in furtherance of an ordinary criminal defense, primarily because of the difficulty in locating relevant witnesses. Over the years, the witnesses who are acquainted with the defendant are likely to have become geographically dispersed and more difficult to trace than guilt-phase witnesses. Indeed, constructing a mitigating case on the basis of the life-history investigation is perhaps best viewed as a successive winnowing process: the attorney's investigator tracks down all mitigating leads; the attorney next interviews the most promising contacts and then chooses to call some of them at the penalty phase of the trial in accordance with a coherently developed strategy.

*Id.*

In this case, trial counsel failed to conduct an investigation that came even close to an adequate effort to uncover all potentially available and relevant mitigating circumstances. The later investigation conducted by habeas counsel makes this plain.   As many courts have pointed out, the failure to conduct an adequate investigation defeats the deference that courts assign to reasonable tactical decision-making be defense counsel.   Courts have found counsel's performance unreasonable in cases challenging a failure to present evidence

12

favorable to a defendant, where counsel failed to make "reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary," *Strickland*, 466 U.S. at 691; *see also, Rompilla v. Beard*,   125 S.Ct. at 2463; *Williams v. Taylor*, 529 U.S. at 396; *Marshall v. Cathel*, 468 F.3d 452 (3rd Cir. 2005); *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) (en banc); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000); *Smith v. Stewart*, 189 F.3d 1004, 1008 (9th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992); *Kenley v. Armontrout,* 937 F.2d 1298, 1309 (8th Cir. 1991).

I have reviewed the March 20, 2006 declaration of Jill Miller, MSSW, and agree with her analysis of the scope of a properly-conducted mitigation investigation (*always* the ultimate responsibility of counsel) and her comments regarding standard practices. Her analysis of the wealth of evidence in mitigation that was available in this case, yet never discovered or presented, underscores the effect of an inadequate investigation.

The standard of practice for defending capital cases in 1992-1993 required counsel to investigate the client's complete social history, beginning before the time of conception and continuing to the time of trial, employing the services of appropriately qualified persons where necessary. The standard of practice in 1992-1993 obliged counsel to investigate, *inter alia*, the client's medical history (including hospitalizations, mental and physical illness or

13

injury), alcohol and drug use (including placement in rehabilitation institutions and therapy), and neurological damage or neuropsychological impairment); family and social history (including family trauma such as physical, emotional and sexual abuse, domestic violence, familial instability, familial dynamics of mixed family); other traumatic events such as exposure to criminal violence or the loss of friends and loved ones; educational history (including achievement, performance, behavior, and activities); special educational needs; employment and training history; and prior juvenile and adult correctional experience (including conduct while under supervision/probation, in institutions of education or training, and regarding clinical services).

Reasonably effective counsel in 1992-1993 would have understood that much of the investigation that must be elicited for the penalty phase investigation is very personal and may be extremely difficult for the client, or other witnesses who may possess relevant information, to discuss.   Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. For this reason, the assistance of a person specially trained in recognizing and overcoming such barriers, who has the skills necessary to help the client cope with the emotional and psychological impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

As a practical matter, conducting the type of mitigation investigation demanded by the prevailing standard of practice in 1992-1993 required counsel to locate and interview the

14

client's immediate family members and virtually everyone else who knew Mr. Jones and his family, including neighbors, other relatives, teachers, clergy, doctors, correctional officers (including probation or parole officers or supervisors), and others. It also required counsel to seek and obtain all available documentary records concerning the client's educational history, work history, medical history, military history, family history, etc., as well as comparable records of other family members where they reflect information relevant to the client's own social history. Such records include school records, juvenile court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, divorce, or death records; and so forth.

Trial counsel's investigation appears to have been limited to briefly speaking with Mr. Jones' parents and a minimal attempt at collecting records. Trial counsel acquired some records, including partial U.S. Marines emergency room discharge and disciplinary records, partial Washoe Medical Center records pertaining to Mr. Jones' Pneumonia, Nevada Mental Health Institute records, probation records, Mohave County presentence report, and records from Mohave County Jail. Thus, both the methodology and scope of the investigation into potential mitigating circumstances in this case was wholly inadequate and fell below the minimum standard of practice for defending capital cases in 1992-1993.

Since Mr. Jones' conviction, voluminous and revealing records (which would have been available at the time of trial) have been obtained by post-conviction counsel. These include the following: U.S. Marines physical exams, audiology exams, dental records,

15

progress notes, emergency room records, an abstract of service and medical history, consultation records; Washoe Medical Center admission re: back pain, drug withdrawal and suicide evaluation; Geddes Elementary School records; Glendora Unified School District records; Citrus Community College Records, City College of San Francisco records, U.S. Naval Hospital records re: admission to Alcohol Rehabilitation Service/Substance Abuse Department and U.S. Naval Hospital records for acute alcohol intoxication.

It is my conclusion, with regard to the scope of the mitigation investigation regarding Mr. Jones' family history, background and development, that the investigation was sub-par and fell well below the prevailing professional norms of 1992-1993. The records of child abuse and family dysfunction that have been uncovered by habeas counsel present powerful case for life.

### Conclusion

Even the most aggravated of cases can be defended and life verdicts can be obtained. In my opinion, a properly presented mitigation investigation on behalf of Mr. Jones would have resulted in a life sentence. At the very least, my overall view of this case leads me to conclude that there is a reasonable probability that, but for the errors of counsel, the result would have been different. It is simply not possible to have confidence in a death verdict rendered under the circumstances presented in this case.

Thus, as summarized above, it is my opinion that, in the several areas delineated herein, the performance of Mr. Jones' trial counsel fell below an objective standard of

16

reasonableness under prevailing professional norms and that he was, therefore, denied the

effective assistance of counsel as guaranteed by the United States Constitution.

I declare under penalties of perjury, 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on June 5, 2006, at Montclair, New Jersey.

DAVID A. RUHNKE

# ATTACHMENT A

RUHNKE & BARRETT
ATTORNEYS AT LAW

DAVID A. RUHNKE
  MEMBER N.J. AND NEW YORK BARS
davidruhnke@ruhnkeandbarrett.com
JEAN DESALES BARRETT
  MEMBER N.J. AND COLORADO BARS
  jeanbarrett@ruhnkeandbarrett.com

47 PARK STREET
MONTCLAIR, NEW JERSEY 07042

(973)744-1000
(973)746-1490 (FAX)

**Resume of Death Penalty Experience – David A. Ruhnke**
(Revised June 2006)

| | |
|---|---|
| Education: | B.A., English Literature, Dartmouth College, 1965 |
| | J.D. *cum laude*, Seton Hall University, 1975 |
| | Class rank -1/250 |

| Work History: | | |
|---|---|---|
| | 1965-1967: | Management trainee |
| | | Prudential Ins. Co. of America |
| | | Newark, New Jersey |
| | 1967-1969: | Peace Corps Volunteer |
| | | Republic of the Philippines |
| | 1969-1970: | Instructor of English |
| | | East-West Cultural Institute |
| | | Chiba City, Japan |
| | 1970-1972: | Free-lance journalist/photographer |
| | | Part-time construction worker |
| | 1972-1975: | Summer employment in law school: project to revise New Jersey child-abuse legislation (summer, 1973); law clerk Office of the Federal Public Defender for the District of New Jersey (summer, 1974) |
| | 1975-1976: | Law clerk to Hon. Lawrence A. Carton, Jr., Presiding Judge, Appellate Division New Jersey Superior Court |
| | 1976-1983: | Assistant Federal Public Defender for the District of New Jersey |
| | 1983-present: | Partner, Ruhnke & Barrett, Montclair, New Jersey |

1

DAVID A. RUHNKE
Death Penalty Resume
Page 2

Teaching:          Formerly adjunct faculty member, Seton Hall University Law School, teaching primarily Criminal Law and Criminal Procedure (inactive at present).

Bar
Admissions:        State of New Jersey, 1975
                   State of New York, 1984
                   District of New Jersey, 1975
                   Eastern District of New York, 1983
                   Southern District of New York, 1983
                   First Circuit, 2004
                   Second Circuit, 1993
                   Third Circuit, 1977
                   Tenth Circuit, 1997
                   United States Supreme Court, 1983

Memberships:  New Jersey Bar Association; National Association of Criminal Defense Lawyers; Association of Criminal Defense Lawyers of New Jersey (Past President and chair of death-penalty committee); New Jersey State Bar Association, Criminal Law Section (former trustee); former member, Death Penalty Subcommittee, Federal Defender Advisory Committee, Administrative Office of the United States Courts (Defender Services Division).

FEDERAL DEATH-PENALTY CASES (trial level):[1]

- *Zebroski v. Delaware* (D. Del. 2005). Court-appointed by Hon. Kent A. Jordan, U.S.D.J., as substitute counsel where conflict had arisen, to represent death-sentenced prisoner raising a federal challenge to his conviction and sentence in the state courts of Delaware. Pending argument on the petition.

- *United States v. Kenneth McGriff* (E.D.N.Y. 2005). Court-appointed by Hon. Edward R. Korman, Chief Judge, E.D.N.Y. Defendant alleged to be a major drug-dealer and to have killed two individuals, including rap artist "E Money Bags." Case is set in the context of the rap music industry and it is alleged that the defendant's drug profits were laundered through a major rap label, "Murder, Inc." Case authorized by Attorney General and is on interlocutory appeal to the Second Circuit.

---

[1]The date shown is the year of entry into the case as retained or appointed counsel.

- *United States v. Dwayne Palmer* (S.D.N.Y. 2005). Court-appointed by Hon. Michael Mukasey, Chief Judge, S.D.N.Y. Killing during high-speed car chase involving rival drug-dealers. Pending review by U.S. Attorney.
- *United States v. Damion Hardy* (E.D.N.Y. 2005). Court-appointed by Hon. Raymond Dearie, U.S.D.J. Murders in the context of drug-dealing in Brooklyn. Pending review by United States Attorney.

- *United States v. Harry Guzman* (D. Mass. 2005). Court-appointed by Hon. Joseph L. Tauro, U.S.D.J. Defendant suspected of series of arsons in Lawrence, MA, in 2003, one of which killed a mother and her infant daughter. Attorney General did not authorize for capital prosecution.

- *United States v. Khalid Barnes* (S.D.N.Y. 2005). Court-appointed by Hon. Stephen C. Robinson, U.S.D.J.. Double-homicide in suspected drug rip-off. Defendant alleged to be shooter and the Principal Administrator of major drug organization operating in Peekskill, New York. Authorized for capital prosecution. Pending trial in January 2007.

- *United States v. Keith Nelson* (W.D.Mo. 2004). Appointed as post-conviction counsel. Client sentenced to death in fall, 2001, for murder-kidnap of 10-year old girl. Sentence of death affirmed on direct appeal. Pending hearing.

- *United States v. Vincent Pagan* (S.D.N.Y. 2004). Court-appointed by Hon. Loretta A. Preska, U.S.D.J. Single murder occurring in context of drug-dealing. Case was not authorized for capital prosecution. Defendant was released on house-arrest conditions throughout process.

- *United States v. Mario Hernandez* (D.P.R. 2004). Court-appointed by Hon. Juan M. Perez-Gimenez. Carjacking murder of young woman victim whose body has never been recovered. Allegations are that victim was sexually assaulted and tortured prior to death. Attorney General did not authorize for capital prosecution.

- *United States v. Bing Yi Chen* (S.D.N.Y. 2003). Court-appointed by Hon. Deborah K. Batts, U.S.D.J. Double homicide in context of large-scale drug-dealing. Attorney General did not authorize for capital prosecution.

- *United States v. Christian DelRosario* (S.D.N.Y. 2003). Court-appointed by Hon. Gerard E. Lynch, U.S.D.J. Double homicide in context of large scale drug-dealing. Attorney General did not authorize for capital prosecution.

3

- *United States v. Albert Burgos* (S.D.N.Y. 2003). Court-appointed by Hon. Loretta A. Preska, U.S.D.J. Single murder occurring in context of drug-dealing and gang activity. Attorney General did not authorize for capital prosecution.

- *United States v. Freddy Abad* (S.D.N.Y. 2002). Court-appointed by Hon. George P. Daniels. Indictment alleges single murder, accompanied by torture and home invasion, of reputed drug dealer in unsuccessful effort to steal drugs and money. Death penalty was not sought after it was demonstrated the defendant was mentally retarded.

- *United States v. John Petrucelli* (S.D.N.Y. 2002). Court-appointed by Hon. Thomas P. Griesa. Defendant accused of single murder occurring in 1995 in an organized crime context. United States did not request authorization to seek the death penalty.

- *United States v. Gary Lee Sampson* (D.Mass. 2001). Court-appointed by Hon. Mark L. Wolf, U.S.D.J. Defendant guilty of committing three murders in Massachusetts and New Hampshire while on run from bank robbery prosecution. Case tried from September through December 23, 2003. Death verdict. Pending briefing on direct appeal.

- *United States v. Michael O'Driscoll* (M.D.Pa. 2001). Court-appointed by Hon. Malcolm Muir, Senior Judge. Prisoner killed fellow prisoner at the United States Penitentiary, Allenwood. Defendant alleged to have a long and serious history of violence, including prior murder. Case authorized for capital prosecution. Life verdict, March 2003.

- *United States v. Elijah Bobby Williams* (S.D.N.Y. 2000). Court-appointed by Hon. Naomi Reice Buchwald, U.S.D.J. Allegations of a triple homicide occurring in the context of large-scale drug trafficking and racketeering. Case authorized for capital punishment, over contrary recommendation of United States Attorney. Case went to trial in spring of 2005. At bi-furcated penalty phase, jury rejected sole statutory aggravating factor and case did not proceed to mitigation phase.

- *United States v. Khalfan Khamis Mohamed* (S.D.N.Y.1999). Court-appointed by Hon. Leonard Sand, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994 and charged the defendant with participation in the August 1998 bombings of the American Embassies in Kenya and Tanzania, allegedly at the behest of the lead defendant, Usama Bin Laden. Case began trial January 3, 2001. Defendant convicted of the murder of 11 people in the bombing of the embassy in Dar es Salaam. Life verdict July 2001. Defendant later withdrew appeal of underlying

conviction.

• *United States v. Anthony Greco* (S.D.N.Y. 1999). Court-appointed by Hon. Lawrence McKenna. Case brought pursuant to Federal Death Penalty Act of 1994. Alleged single murder in organized crime context. United States did not seek capital authorization.

• *United States v. John Tibbs* (D.Mass. 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did not authorize for capital prosecution.

• *United States v. Lee Arthur Taylor* (D.Mass 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did not authorize for capital prosecution.

• *United States v. Joseph Calco* (E.D.N.Y. 1999). Court-appointed by Hon. Edward R. Korman, U.S.D.J. Three murders set in organized crime/narcotics trafficking context. Defendant entered into cooperation agreement with the United States and death-penalty not sought.

• *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y. 1998). Retained as co-counsel to Gerald Shargel, Esquire. Brought pursuant to Federal Death Penalty Act of 1994. Millionaire Sikh businessman charged with two murders-for-hire to silence witnesses to fraudulent scheme. Convicted after eight-week trial. Penalty phase ended in unanimous life verdict.

• *United States v. Clarence Heatley* (S.D.N.Y. 1996). Court-appointed by Hon. Sonia Sotomayor, U.S.D.J. Drug "kingpin" case. Nineteen murders. Death penalty authorized for Heatley and co-defendant. Both capital defendants plead out to life sentences.

• *United States v. Moses Clary* (D.N.J. 1996). Court-appointed by Hon. Joseph Rodriquez as co-counsel to Federal Public Defender. Brought pursuant to Federal Death Penalty Act of 1994. Bank-robbery shoot-out at suburban shopping mall. Two bystanders and one perp killed. Security guard wounded. (Guard killed one by-sander; dead perp killed other. Clary was the survivor.) Death-penalty authorized. Plead to life sentence.

• *United States v. David Paul Hammer* (M.D. Pa. 1996). Court-appointed by Hon. Malcolm Muir, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of

1994.   Prison killing at U.S.P./Allenwood.   Defendant charged with strangling cellmate. Defendant confessed in grisly detail, said he did not fear the death-penalty and that, given the opportunity, he would kill again.  Was serving equivalent of life sentences from Oklahoma.  In federal custody as "transfer" since Oklahoma could not keep him from running economic and other scams from Oklahoma State Prison.  IQ of 138.  Death-penalty authorized and death verdict returned 7/98.  Client withdrew appeal in order to speed his execution.  *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000).  Client changed mind again and execution date of 11/15/00 was vacated. Petition for post-conviction relief was filed, which client then attempted to withdraw several times.  A June 2004 execution date was also vacated by the Third Circuit.  In December 2005, after extensive hearings, the district court vacated the sentence of death on the basis of a *Brady* violation.

- *United States v. Chen* (E.D.N.Y. 1995).   Court-appointed by Hon. Edward R. Korman, U.S.D.J.  Case brought pursuant to Federal Death Penalty Act of 1994. Charged rape/torture/shooting death of Chinese immigrant held captive for ransom and/or repayment of fees owed to smugglers.  Department of Justice authorized capital prosecution in summer of 1996.  Plead guilty to life sentence.

- *United States v. Christopher Green* (D.N.J. 1995).  Court-appointed by the Hon. Joseph H. Rodriguez, U.S.D.J., as co-counsel to Federal Public Defender.  Case brought pursuant to Federal Death Penalty Act of 1994.  On March 21, 1995, Christopher Green, a 29 year-old man with no criminal record, entered a small postal sub-station in Montclair, New Jersey and announced a robbery.  After receiving approximately $5,000, he ordered the five people in the post office — two postal employees and three customers — to the ground and methodically shot each in the head with a 9mm pistol loaded with "Black Talon" bullets.  Four of the individuals died instantly; the fifth survived made a full recovery.  After several negotiating sessions, the United States Attorney dropped her request for the death penalty and, on June 8, 1995, Green entered a guilty plea to the indictment and was sentenced to a life sentence without parole on September 22, 1995.

- *Moore v. Reynolds* (W.D.Ok 1994).  Court-appointed by Hon. Robin J. Cauthron, U.S.D.J., to represent death-sentenced Oklahoma inmate on federal habeas.  Petition denied January, 1997.  Decision affirmed by divided panel of Tenth Circuit.  *Moore v. Reynolds*, 153 F.3d 1086 (10th Cir. 1998).  Supreme Court denied *certiorari*. Board of Pardon and Parole refused clemency.  Client executed 6/3/99.

- *United States v. Tyrone Walker* (N.D.N.Y. 1994).  Court-appointed by Hon. Thomas J. McAvoy, Chief Judge.  Drug "kingpin" case.  Case went to trial from October

1995 to February 1996.  Convicted.  At penalty, jury found defendant responsible for two additional murders.  Jury returned a non-unanimous life verdict.

- *United States v. Michael Murray* (M.D.Pa. 1993).  Court-appointed by Hon. Sylvia H. Rambo, Chief Judge.  Drug "kingpin" case.  Young client (19) charged with drug-related shooting of 20 year-old drug-dealer.  DOJ withdrew death authorization three days before jury-selection.

- *United States v. Dandeny Munoz-Mosquera* (E.D.N.Y. 1993).  Court-appointed by the Hon. Sterling Johnson.  Drug "kingpin" case.  Defendant alleged "assassin" for the Medillin Cocaine Cartel; co-defendant was the late Pablo Escobar, alleged head of the cartel and then a fugitive in the Republic of Colombia.  The capital count charged mid-air bombing of a domestic Colombia airliner (Avianca Airlines) in which 110 people — including two American citizens — were killed.  The United States Attorney in Brooklyn eventually declined to seek Justice Department authorization and the case went to trial as non-capital prosecution.

- *United States v. Thomas Pitera* (E.D.N.Y. 1992).  Court-appointed by the Hon. Reena Raggi, U.S.D.J.  Drug "kingpin" case.  First such prosecution in Eastern District of New York.,  Case alleged nine murders set in context of organized-crime RICO and CCE.  Client was 38-year old alleged "made member" of Bonnano organized crime family.  At conclusion of guilt-phase, jury convicted client of seven homicides.  At death-penalty phase, divided jury returned life verdict.

- *United States v. Bilal Pretlow* (D.N.J. 1992).  Court-appointed by the Hon. Harold A. Ackerman, U.S.D.J.  Drug "kingpin" case. First such case in District of New Jersey.  After several weeks of trial, 21-year old client committed suicide by hanging self in jail cell.

STATE DEATH-PENALTY CASES (trial level):

- *State v. Robert Morton* (New Jersey Superior Court 1999).  Designated counsel by Public Defender (with law partner, Jean D. Barrett) Post-conviction challenge to sentence of death.  After full re-investigation and five-day evidentiary hearing, death sentence vacated, June 2005.  State did not appeal.  Life sentence imposed.

- *State v. James Minett* (New Jersey Superior Court 1996).  Designated counsel by Public Defender (with law partner, Jean D. Barrett).  Murder-for-hire of defendant's girlfriend.  Shooter cooperated and testified.  Life verdict spring 1998.  Conviction affirmed on appeal.  Pending federal habeas filing.

- *State v. William David Jones* (New Jersey Superior Court 1995). Designated counsel by Public Defender (with law partner, Jean D. Barrett). On July 19, 1995 defendant was arrested for knife-, bat- and pitchfork-slaying of acquaintance. Related charge of sexual assault. Case tried in fall of 1999 into early 2000. Jury convicted of capital murder after seven days of deliberations. Jury deliberated slightly over one hour after three-day penalty-phase presentation and did not find any aggravating factors. Guilt-phase verdict pending appeal.

- *State v. Eddie Lee Oliver a/k/a Al Damany Kamau* (New Jersey Superior Court 1993). Designated counsel by Public Defender (with law partner, Jean D. Barrett). Defendant charged with June 3, 1993 murder of a Newark Police Officer as he waited to testify in the hallway outside a courtroom on the 11th floor of the Essex County Courthouse in Newark, New Jersey. In the ensuing escape attempt, a sheriff's officer was shot in the chest. Defense was insanity. Jury convicted after five days of deliberations but, after two days of penalty deliberations, returned a non-unanimous verdict rejecting death penalty.

- *State v. Anthony McDougald* (New Jersey Superior Court 1990). Designated counsel by Public Defender (with law partner, Jean D. Barrett). This was a double-murder by stabbing of the parents of the 13-year old girlfriend of 27-year old defendant. After the murder, he inserted baseball bat into the vagina of the mother with the comment that this was in retaliation for her having given birth to the 13-year-old. Aggravating factors were that the murders were outrageously and wantonly vile and that they were committed to avoid prosecution for another offense. (The statutory rape of the 13-year-old.) This case was a penalty-only re-trial after the New Jersey Supreme Court affirmed the murder convictions but vacated the death verdict. See *State v. McDougald*, 120 N.J. 523, 577 A.2d 419 (1990). On November 18, 1995, following six weeks of jury selection and a two-week trial, the jury returned a verdict for life.

- *State v. Bryan Coyle* (New Jersey Superior Court, 1991). Designated counsel by the Office of the Public Defender (with law partner, Jean D. Barrett). This was a shooting death of the husband of a woman with whom defendant was romantically involved. Aggravating factors were that defendant has a prior murder conviction and that the killing was outrageous and wantonly vile in that it was a killing committed purely for the pleasure of killing. First jury convicted and imposed death sentence. This was a re-trial following the New Jersey Supreme Court's reversal of both the guilt- and penalty- phase verdicts. See *State v. Coyle*, 119 N.J. 194, 574 A.2d 951 (1990). After plea negotiations, prosecution withdrew aggravating factors and

defendant plead guilty to murder and was sentenced to 30 years.

- *State v. Julius Boeglin* (New Jersey Superior Court 1990).  Retained as counsel to handle pre-trial motions and jury-selection only (with law partner, Jean D. Barrett). Aggravating factors were murder-by-hire and avoiding detection for another offense. Allegations were defendant — the son of a millionaire industrialist — paid another to kill victim for informing on defendant's drug activities.  Case went to trial with substituted counsel and jury returned verdict of non-capital murder.

- *State v. James Jerald Koedatich* (New Jersey Superior Court, 1990).  Designated counsel by the Office of the Public Defender (with law partner, Jean D. Barrett). Case involved the kidnaping, sexual assault and stabbing murder of an 18-year old adopted Korean girl.  Aggravating factors were the defendant's two prior murder convictions; that murder was committed in a manner that was outrageous and wantonly vile; that murder was committed for the purpose of escaping detection for the other felonies; and that murder was committed in the course of certain other felonies.  This was a penalty-phase only re-trial.  Because of the massive publicity, venue was moved out of the county where the crime occurred to a rural adjacent county.  Trial took place in the summer of 1990.  Jury selection took approximately five weeks.  There was one week of penalty-phase evidence. Jury was unable to agree unanimously on whether the death penalty should be imposed and, therefore, as required by New Jersey law, defendant was sentenced to life imprisonment.

- *State v. Eneida Berrios* (New Jersey Superior Court, 1983).  Designated counsel by the Office of the Public Defender (with law partner, Jean D. Barrett).  Case involved the arson-murder of a six-year old child motivated by an argument between two families in the City of Newark. Building was set on fire in the middle of the night. Child was trapped.  Aggravating factors were that defendant hired the arsonist and that the murder was outrageously and wantonly vile.  Case tried in 1986.  Defendant found not guilty at conclusion of guilt phase.

## APPELLATE DEATH-PENALTY EXPERIENCE

- *State of Delaware v. Thomas Capano*, 781 A.2d 556 (Del.Supreme Ct. 2001). Retained as appellate co-counsel to politically prominent attorney found guilty of murdering his girlfriend (appointments secretary to the Governor of Delaware) and disposing of her body at sea.  Sentenced to death.  Conviction and sentence of death affirmed by Delaware Supreme Court. *Certiorari* petition pending in United States Supreme Court raising *Apprendi* challenge to Delaware capital punishment scheme. Outcome of case will be controlled by analysis of the United States Supreme Court's

9

decision in *Ring v. Arizona*. Case is now in state post-conviction at the trial level.

- *State v. John Martini, Sr.,* 144 N.J. 603, 678 A.2d 164 (1996). Martini was New Jersey's first potential "volunteer" for execution. Served as counsel to *amicus curiae*, the Association of Criminal Defense Lawyers of New Jersey, taking the position that an otherwise competent defendant may not waive a state court post-conviction challenge to a death sentence where the attorneys handling the case are of the view that there are meritorious issues to be presented. Court accepted that argument. Societal interest in reliability of death sentences outweighs individual defendant's wish to forgo post-conviction review. *State v. Martini,* 144 N.J. 603, 678 A.2d 164 (1996).

- *State v. Marshall,* 130 N.J. 109, 613 A.2d 1059 (1992). *Marshall* was the first death sentence affirmed by the New Jersey Supreme Court. See, 123 N.J. 1, 586 A.2d 85 (1991). (Defendant was convicted of hiring others to murder his wife for insurance proceeds and was subject of book and made-for-TV movie entitled "Blind Faith.") In this aspect of *Marshall,* served as counsel to *amicus curiae,* the American Civil Liberties Union of New Jersey, concerning the methodology to be employed by the New Jersey Supreme Court in carrying out statutorily-mandated proportionality review.

- *State v. Koedatich,* 112 N.J. 225, 548 A.2d 939 (1988). Defendant originally tried and sentenced to death in 1984. Firm became involved in the case on direct appeal to the New Jersey Supreme Court. Above-cited opinion affirmed defendant's underlying convictions by 4-3 vote but unanimously vacated the death penalty. See also, *State v. Koedatich,* 118 N.J. 513, 572 A.2d 622 (1990). State appealed trial court's decision to grant motion striking two of four aggravating factors on ground that previous penalty-phase jury had not been able to reach a unanimous finding that those aggravating factors existed. The New Jersey Supreme Court, in another 4-3 opinion, reversed the trial court and re-instated the dismissed aggravating factors which were then presented to the jury when the penalty-phase was re-tried in the summer of 1990. Jury returned life verdict.

## OTHER RELEVANT EXPERIENCE

- Qualified and testified as expert witness in area of effective assistance of counsel in handling guilt- and penalty-phases of capital-murder cases: *State v. Daniel Webb* (Connecticut Superior Court); *State v. Jermaine Wright* (Delaware Superior Court 1994); *Hooks v. Ward,* (U.S. Dist. Ct., W.D.Ok. 1997); *State v. Jackson,* (Delaware Superior Court 1998); *Mollett v. Ward* (U.S. Dist. Ct. W.D.Ok. 2000); *State v.*

*Donald Loftin* (N.J. Superior Court 2004).

- May 2006. Faculty member, presenter and small group leader at the Capital Training Program of the Center for American and International Law in Plano, Texas.

- November 2005. Faculty member and presenter at annual federal death penalty strategy session, Pittsburgh, Pennsylvania.

- July 2005. Faculty Member, Death Penalty College, Santa Clara University School of Law, July 2005.

- July 2005. Presentation, the Airlie Conference, NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "The Ethics of Representing 'Volunteers.'"

- Faculty member and presenter, Federal Strategy Session, Salt Lake City, Utah, November 2004: "The DOJ Authorization Process; What to Disclose and When?"; "The Case for Life – Keeping the Client On Board"

- April, 2004. Faculty Member, Capital Trial Advocacy Program, Plano, Texas. Small group leader and plenary presentations on mitigating evidence and future danger.

- March 2004. Faculty member and presenter Life in the Balance program, Memphis, Tennessee. Presented small group and plenary sessions on mitigation, closing instructions and penalty-phase summation.

- February 2004. Presentation at the mid-winter meeting of the Association of Criminal Defense Lawyers at San Antonio,. Texas, "Putting a Human Face on the Despised."

- July 2003. Presentation, the Airlie Conference, 2003 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "What we are Learning About Mitigation: Findings from the LifeVote Project."

- March 2003. Faculty member at Federal Strategy Session and Life in the Balance programs, Austin, Texas.

- February 2003. Faculty Member, Virginia Death Penalty College, Richmond, Virginia.

- October 2002.  Presentation to First Circuit Judicial Conference, Chatham, MA. "The Ability of the Federal Courts to Handle Cases of International Terrorism."
- August 2002.  Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA

- April 23, 2002, Presentation, Internal Law Society, Suffolk University Law School, Boston, "International Law Issues Arising from the Embassy Bombing Case."

- National Seminar for Federal Defenders, Philadelphia, March 13-15, 2002. Presentation, "Mitigating Evidence in Death Penalty Cases."

- 2002 Federal Capital Defense Strategy Session, Kansas City, MO, March 8, 9, 2002. Presentations:  Discussion Leader, Caucus of First, Second and Third Circuits; "Political and Terrorist Prosecutions," (with Jerry Zerkin and David Bruck); "Mitigation: Federal Jury Findings" (with Margaret O'Donnell and William Brennan);  "Ethical Considerations in Federal Capital Cases" (with Carol Kolinchak and David Lewis); "Litigating Racial, Ethnic and Geographic Diversity" (with Sam Gross and Tim Sullivan);  "Mitigation that Opens the Door" (with Jerry Zerkin, David Bruck and Mark Cunningham).

- Faculty Member, South Carolina Bar Association's 17th Annual Update on the Criminal Law, Charleston, South Carolina January 2002, Panel, "The Criminal Law in the Aftermath of September 11."

- Faculty Member, Capital Trial Advocacy Program, Austin Texas, January 2002. Small group leader and plenary presentation, "Thinking About, Discovering and Presenting Mitigating Evidence"

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 2001.

- Daylong seminar, "Saving Lives in a New Millennium," co-sponsored by the Association of Criminal Defense Lawyers of New Jersey and the ABA Death Penalty Representation Project, moderator and speaker, "Capital Cases – Answering the Hardest Question," East Brunswick, N.J., March 17, 2001

- Presentation, Federal Death Penalty Strategy Session, "Volunteers – Dealing With the Client Who has Lost the Will to Fight," Albuquerque, NM, March 3, 2001

- August 2000.  Presentation, the Airlie Conference, 2000 NAACP Legal Defense

Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "Jury-Selection in Capital Cases."

- Faculty Member, Clarence Darrow Darrow Death Penalty College, University of Michigan Law School, Ann Arbor, MI, May 2000

- Presentation, Federal Death Penalty Strategy Session, "The Department of Justice and the Authorization Process," Crystal City, MD, March, 2000.

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 1999.

- Presentation to Federal Defense Investigators Conference, New Orleans, LA, May 1999, "Investigating Mitigating Evidence."

- Life in the Balance, Atlanta, GA, May 1999 (National Legal Aid and Defenders Association), faculty member. Presentation at special federal death-penalty seminar and in general sessions on "What to do When a Client Volunteers for Execution?" and "Opening Address to the Jury at a Penalty Phase."

- American Academy of Forensic Psychology, Philadelphia, PA, April 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- American Academy of Forensic Psychology, Palm Springs, CA, January 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."
- American Academy of Forensic Psychology, New Orleans, LA, January 1997, co-presenter, with Alan Goldstein, Ph.D. and Jean D. Barrett, Esquire, of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- Life in the Balance, Dallas, TX, March 1997 (National Legal Aid and Defender Association), faculty member. Presentations on "Cross-examining the Government's Expert;" "Working with Expert Witnesses;" "Brainstorming the Case;" and "Direct Examination of Penalty-Phase Witnesses."

- Presentation, seminar sponsored by Federal Judicial Center, "Appellate Capital Case Issues: the Attorney's Perspective," Miami, FL, August 5, 1996.

- Presentation, "Death is Different," at training seminar sponsored by New York

Capital Defender Organization, Rochester, NY, March 1996.

- Presentation, the Airlie Conference, 1996 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, "Hard Lessons Learned from Federal Death Penalty Cases," July 26, 1996 at Georgetown University, Washington, D.C.

- Presentation, "Death is Different," at training seminar sponsored by New York Capital Defender Organization, White Plains, NY, October, 1995.

- Presentation, "Counsel in Federal Death Penalty Cases," 1995 meeting of Federal Defenders and Resource Center Directors, Marco Island, FL, January 1995.

- Presentation, "Why Death is Different," New York Association of Criminal Defense Lawyers, N.Y.U. Law School, New York, NY, February 1995.

- Presentation, "Opening Arguments in a Death Penalty Case," Life in the Balance (National Legal Aid and Defender Association), Austin, TX, March 1994.

- Presentation, "The Federal Death Penalty," July 1994 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Presentation, "Litigating the Federal Death Penalty Case," Ohio Association of Criminal Defense Lawyers, Columbus, OH, December 2, 1994.

- Presentation, "Opening and Closing in Theme," 1993 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Keynote speaker and panel member, "Saving Client's Lives in the 90's." Day-long seminar presented by the Association of Criminal Defense Attorneys of New Jersey.

# ATTACHMENT B

## Materials Reviewed by David A. Ruhnke

Trial materials

Police reports

Sentencing documents

Prior Offenses/Probation records

Poems and artwork by Danny Jones

Military records

Arizona Department of Corrections medical records

Mohave County Jail records

Medical records

School records

Habeas pleadings

Habeas investigative reports

Reports of Habeas interviews re: substance abuse

Declarations of jurors

Affidavit of Lee Novak

Affidavit of Kenneth Everett

Declarations and depositions of family members

Jeannette L. Sheldon's declaration

Dr. Lisa Sparks (Addictionologist) Curriculum vitae, notes and interview

Dr. Jack Potts' reports

Dr. Alan Goldberg's report and deposition

David Freedman's declaration and deposition

Dr. Shoba Sreenivasan's report and deposition

Dr. Pablo Stewart's declaration and deposition

Dr. David Foy's report and deposition

Dr. Herron's deposition

Dr. John Scialli's report (including supplements) and deposition

Dr. Anne Herring's report and deposition

Declaration of Jill Miller, MSSW

Stipulation of Ted McNevin