1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Danny Lee Jones,                          )    No. CV-01-384-PHX-SRB
                                                )
10                    Petitioner,               )    DEATH PENALTY CASE
                                                )
11   vs.                                        )
                                                )
12                                              )
                                                )    **ORDER RE: CLAIMS 20(O), 20 (P),**
13   Dora Schriro, et al.,                      )    **AND 20(T)**
                                                )
14                    Respondents.              )
                                                )
15   _____        )

16        Danny Lee Jones (Petitioner) is an Arizona inmate seeking federal habeas relief in

17   connection with his convictions and death sentences for the first-degree murders of Robert

18   and Tisha Weaver.  On March 21-23, 2006, the Court held an evidentiary hearing regarding

19   Claims 20(O), 20(P), and 20(T) of Petitioner's amended habeas petition.  The claims allege

20   ineffective assistance of trial counsel at sentencing based on counsel's failure to investigate

21   and present mitigating evidence.  (Dkt. 54 at 126-29.)[1]  On June 9, 2006, the parties

22   submitted written closing arguments.  (Dkts. 218, 219.)  For the reasons set forth herein, the

23   Court finds that Petitioner is not entitled to relief.[2]

24

25

26   _____

27        [1]        "Dkt." refers to the documents in this Court's case file.

28        [2]        The Court will address Petitioner's remaining habeas claims in a separate
     order.

**STATE COURT PROCEEDINGS**

**1.    Trial and sentencing**

In 1993 Petitioner was tried in Mohave County Superior Court for the murder of Robert Weaver and Weaver's seven-year-old daughter, Tisha, and the attempted murder of Weaver's seventy-four-year-old grandmother, Katherine Gumina.[3]    Petitioner was represented by Mohave County Assistant Public Defender Lee Novak.  At the outset of the case, Novak was assisted by Katie Carty, a young attorney in his office.

The trial evidence showed that all of the victims were attacked with a baseball bat. The evidence also indicated that the child was dragged out from under a bed, then beaten and strangled or smothered.  After the murders, Petitioner, who was unemployed and the subject of outstanding warrants, removed the gun collection from the victims' house and traveled to Las Vegas, selling the guns to pay for cab fare and living expenses.

At trial Petitioner testified that he killed Weaver in self-defense and that he struck Ms. Gumina reflexively when she startled him.  He further testified that while he was fighting with Weaver in Weaver's garage, Frank Sperlazzo, an acquaintance of Petitioner who was attempting to collect a drug debt from Weaver, entered the house and killed Tisha as he was stealing Weaver's guns.  Also testifying on Petitioner's behalf was Dr. Lisa Sparks, M.D., an expert on addictions, who detailed the effects of Petitioner's long-term substance abuse, particularly his abuse of methamphetamine.

On September 13, 1993, the jury convicted Petitioner on all counts.  The trial court set sentencing for November 8, 1993, ordered a presentence report ("PSR"), and granted Petitioner's request for a mental health examination pursuant to Arizona Rule of Criminal Procedure 26.5.

At a presentence conference on October 28, 1993, the court granted Novak's

---

[3]    Ms. Gumina ultimately died as a result of her injuries, but the State chose not to amend the indictment. *State v. Jones*, 185 Ariz. 471, 478, 917 P.2d 200, 207 (1996).

unopposed request to continue sentencing and ordered Dr. Potts to complete his Rule 26.5 evaluation by November 29, 1993. (ROA at 32; RT 10/28/93 at 3-4.)[4] Because Dr. Potts wanted to review the probation department's PSR before completing his evaluation, the court ordered that the PSR be completed by November 4, 1993, and set a further presentence conference for December 1, 1993. (RT 10/28/93 at 3-4.) The sentencing hearing was scheduled to begin on December 8, 1993. (*Id.*) On November 22, 1993, the court held a hearing at Novak's request because Dr. Potts had not yet evaluated Petitioner; following the hearing, Petitioner was transported to Phoenix for the evaluation. (RT 11/22/93 at 2; ROA 235.) Dr. Potts interviewed Petitioner on November 26, 1993. (RT 12/1/93 at 2.) At the presentence conference on December 1, 1993, the court informed the parties that it had transmitted a copy of the PSR to Dr. Potts, who had not previously received it, and indicated that Dr. Potts was to submit his report on December 6. (*Id.*) Both parties informed the court that they were arranging for witnesses to appear at the December 8 hearing. (*Id.* at 3.) Although the record does not indicate when the parties received Dr. Potts's report, it was dated December 3. (Ex. 23.)

On December 8, 1993, the sentencing hearing was held. As part of Petitioner's mitigation case, Novak presented testimony from Petitioner's stepfather, Randy Jones. Jones testified that Petitioner's biological father, the first husband of Petitioner's mother, physically abused Petitioner's mother while she was pregnant – in one instance throwing her down a flight of stairs – and that during Petitioner's birth her heart had stopped and forceps had been used to deliver Petitioner. (RT 12/8/93 at 41, 44-45.) Jones testified that when Petitioner

---

[4]     "RT" refers to the state court reporter's transcript; "ROA" refers to the three-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-93-541-AP). "ROA-PCR" refers to the four-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-00-512-PC). The original reporter's transcripts and certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court. (*See* Dkt. 14.) "Ex." refers to the exhibits admitted at the evidentiary hearing before this Court.

1   was four, he experienced black-outs, and for years thereafter bruised easily due to a calcium

2   deficiency. (*Id.* at 42-46, 65.) He testified that Petitioner's first stepfather, the second

3   husband of Petitioner's mother, verbally and physically abused Petitioner, Petitioner's half-

4   sister, and Petitioner's mother. (*Id.* at 42-46.) Jones also testified about various head injuries

5   suffered by Petitioner, which occurred when Petitioner was approximately thirteen, fifteen,

6   and nineteen years old. (*Id.* at 47-48, 49, 50, 65.) In each of the first two incidents,

7   Petitioner had fallen off roofs; although he was treated for concussions, no medical records

8   were available. (*Id.* at 48, 49, 65-67.) The last incident, which, according to Jones, resulted

9   in unconsciousness and hospitalization, occurred during a mugging while Petitioner was

10  serving in the Marines. (*Id.* at 50.) Jones also testified regarding Petitioner's history of drug

11  and alcohol use, which began when he was about thirteen, and his participation in drug

12  treatment programs, including an in-house facility in San Francisco where he stayed for

13  almost two years. (*Id.* at 52-61.) Jones described how Petitioner's behavior deteriorated

14  after he began abusing substances; he also described Petitioner's behavior as improving when

15  he was placed on the drug lithium. (*Id.* at 51-52, 55-57, 60-61.)

16          Dr. Potts took the stand after hearing Jones's testimony. Dr. Potts testified that he had

17  been unaware at the time he wrote his report that Petitioner had fallen off a roof when he was

18  fifteen. (*Id.* at 77-78.) He noted another head injury Petitioner suffered when he was six or

19  seven in which he was reportedly unconscious for about twenty minutes; this incident had

20  not been mentioned by Jones. (*Id.*) Dr. Potts also noted that he had not included in his report

21  Petitioner's episodes of passing out when he was four. (*Id.*) However, Dr. Potts stated that

22  these additional incidents did not cause him to alter his opinions regarding Petitioner's

23  condition. (*Id.* at 78.) When asked whether he believed he had adequate data to offer an

24  opinion regarding mitigating findings, Dr. Potts stated that he was always willing to review

25  additional information, and that:

26

27              I believe everything I reviewed and what I have heard about the case
                and reviewed with the defendant, his comments to me. I would have liked, and
                I think I have – I think it would be valuable to have had some neurologic

28

evaluations, not – by a neurologist, clinical exam, such as a CAT scan, possibly an MRI, possibly EEG, possibly some sophisticated neurological testing, because I think there's very strong evidence that we have – well, there's clear evidence that we have, I believe, of traumatic brain injury, and there's some other evidence that I believe we may have organic neurologic dysfunctions here that has gone on since he's been about 13. So, there's some other testing that I think would be valuable to have to pin down the diagnosis. Again –

Q.     And you think that further testing might shed some additional light on, perhaps, some of these factors you listed and maybe why Mr. Jones behave[d] in the way he did on March 26, 1992?

A.     Yes. I think it could help in clarifying and giving us etiology as the behavioral components, the explosive outbursts, the aggression, the mood changes, and the changes that occurred in his personality as noted by his mother when he was about 13, 14 years of age.

Q.     In your opinion, could that information possibly provide significant mitigating, any – a significant mitigating factor as to what would be relevant to the issues at this hearing?

A.     Clearly I think it would be corroborative of my clinical impressions and my diagnostic impressions in my report.

(*Id.* at 78-80.)

Dr. Potts then identified seven factors that he considered mitigating. (*Id.*) First was Petitioner's "chaotic and abusive childhood" and its effect on his mental health and development, about which Dr. Potts offered detailed testimony. (*Id.* at 80-83.) Dr. Potts also listed as mitigating circumstances Petitioner's history of significant substance abuse, the likelihood that he suffered from an attenuated form of bipolar disorder, the fact that he had a history of multiple head traumas, and genetic loading for substance abuse and affective disorders. (*Id.* at 83-92, 94-98, 100-04.) In discussing Petitioner's head traumas, Dr. Potts noted that there were usually "long term neurologic sequelae" that can damage the brain and make it susceptible to other changes, such as lowered thresholds for aggressive outbursts. (*Id.* at 100.) He testified that additional testing would "clearly assist in coming to a more definitive conclusion" regarding whether Petitioner had brain damage. (*Id.* at 103.) Dr. Potts recommended additional testing "specifically for forensic purposes." (*Id.* at 137.)

Following Dr. Potts's testimony, Novak asked the court for a continuance to obtain the testing recommended by Dr. Potts as additional potential mitigation and to bolster the basis for Dr. Potts's opinion, which the prosecution had challenged in part because such

testing had not been conducted.  (*Id.* at 150-51, 165.)  Novak explained that until he had received Dr. Potts's report, two days prior to the hearing, and heard his testimony, he had not realized the significance of Petitioner's history of head traumas with respect to possible neurological damage.  (*Id.*)  The prosecution opposed the request, arguing that a factual basis did not exist for neurological testing.  (*Id.* at 153-54.)  Novak replied that Dr. Potts had not had sufficient time prior to the hearing to obtain neurological testing after receiving materials from the parties.  (*Id.* at 154-55.)  After briefly taking the request under advisement, the trial court denied it, noting that Novak had previously retained Dr. Sparks, who had testified at trial, and stated that "if there were any follow-up questions of a psychological or neurological nature, I would think that the defense would have followed them up" prior to sentencing. (RT 12/8/93 at 165.)  The court indicated that it would review the transcript of Dr. Sparks's trial testimony before sentencing Petitioner the next day.  (*Id.* at 167-68.)

The following day, prior to sentencing, Novak renewed his request for a continuance to obtain the testing recommended by Dr. Potts;  to refute the prosecution's suggestion that Petitioner's head injuries and childhood abuse were wholly unsubstantiated, Novak proffered some of Petitioner's military medical records documenting Petitioner's head injury while he was in the Marines.  (RT 12/9/93 at 6-8, 10-11.)  The trial court admitted the records, but denied the renewed request for a continuance, stating that:

> I have read the case cited by both the State and defense, and also reviewed Dr. Potts's report.  What Dr. Potts said in his report is that he believes that the defendant had head trauma which increases the potential for neurologic sequela contributing to his behavior.  And at the hearing yesterday, my recollection is he was assuming based on the allegation that the defendant had fallen from a roof and hit his head, plus other allegations about head injuries, that he had mild trauma which increased the potential for aggravating the substance abuse.  That's a long shot away, far away in–both in speculation and in fact from what's alleged to have occurred in [*State v. Stuard*, 176 Ariz. 589, 863 P.2d 881 (1993)].
>
> This case has been pending a long time, and I think the evidence is very slim, nonexistent, in fact, that the defendant has anything that requires any kind of neurological examination.  So, I am ready to proceed.

(*Id.* at 16-17.)

In sentencing Petitioner, the trial court found three aggravating factors as to both murders: that they were committed (1) for pecuniary gain, (2) in an especially heinous, cruel, or depraved manner, and (3) during the commission of one or more other homicides. (ROA 117, 118.)  With respect to Tisha's murder, the court found a fourth aggravating factor based on her age. (ROA 117.)   The court rejected Petitioner's testimony that Sperlazzo killed Tisha, concluding that Petitioner had "manufactured this tale" and that "[i]n the past [Petitioner] has shown that he is willing to lie if it benefits him." (ROA 117 at 4.)  The court found no statutory mitigating circumstances with respect to either murder, but found several non-statutory factors: that Petitioner (1) suffered from long-term substance abuse, (2) was under the influence of alcohol and drugs at the time of the offense, (3) had a chaotic and abusive childhood, and (4) that his substance abuse problem might have been caused by genetic factors and aggravated by head trauma. (ROA 117, 118.)  With respect to each murder conviction, the court found that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances or to call for leniency and sentenced Petitioner to death for each of the murders. (*Id.*)  The Arizona Supreme Court affirmed the convictions and sentences on direct appeal. *State v. Jones*, 185 Ariz. 471, 917 P.2d 200 (1996).

**2.      Post-conviction proceedings**

Petitioner sought post-conviction relief ("PCR") from the trial court.  In his PCR petition, he alleged that his counsel was ineffective at sentencing for failing to obtain a defense mental health expert, failing to timely seek neurological and neuropsychological testing, and failing to present additional evidence of Petitioner's abusive childhood, head trauma, and drug abuse; these allegations correspond, respectively, to Claims 20(O), (P) and (T) in the amended habeas petition.  On April 4, 2000, the PCR court held an evidentiary hearing on Claims 20 (P) and (T), but denied a hearing on Claim 20(O).  At the hearing, Randy Jones and Petitioner's mother testified, as did trial counsel Novak.  Jones testified that he first spoke with Novak in July 1992 by telephone, talked with him again in October 1992,

when Novak and Ms. Carty visited the family in Nevada, and spoke a third time just prior to sentencing in December 1993. (RT 4/4/00 at 10, 11, and 15.) During these conversations, Jones provided background information about Petitioner's childhood, head injuries, and history of drug abuse and treatment. (*Id.*) Mrs. Jones testified that she informed Novak about the details of Petitioner's difficult birth, his head injuries, his drug use, which began at approximately age thirteen, and the physical abuse he suffered from his first stepfather. (*Id.* at 26-36.) She also testified that she told Novak that after she married Mr. Jones, Petitioner "had a normal childhood as far as school, baseball," and that they "had a good home life." (*Id.* at 29.) Novak testified that he began work on Petitioner's defense immediately, and that one of the tasks undertaken by Ms. Carty was to develop Petitioner's life history. (*Id.* at 53-54.) He testified that he considered Dr. Potts "part of the defense team." (*Id.* at 102.) He conceded, however, that if he were trying the case today he would immediately seek the appointment of a mitigation specialist. (*Id.* at 51.) He also testified that he only considered the need for a neurological exam after Dr. Potts testified at the sentencing hearing. (*Id.* at 99.)

In its written order, the PCR court denied relief on Claim 20(O) without explanation or factual findings. (ROA-PCR 59 at 2.) With respect to Claims 20(P) and (T), the PCR court stated:

> With regard to Claim 24I[6], petitioner alleges that trial counsel was ineffective at sentencing by failing ". . . to recognize the need for neurological and psychological testing . . ."
> The report and testimony of Dr. Potts who was appointed by the Court, adequately addressed defendant's mental health issues at sentencing.
>
> .     .     .
>
> In Claim 24I(7), petitioner alleges that "Trial counsel failed to present meaningful additional witnesses and available evidence to support Jones' proposed mitigation."
> Testimony at the hearing showed that counsel presented the available witnesses and evidence to support mitigation. The additional witnesses and evidence suggested by petitioner would have been redundant.
> The Court finds that the petitioner has not met its [sic] burden of proof of showing deficient performance by trial counsel.

(ROA-PCR 73 at 2-3.) The PCR court's ruling is the only "reasoned" state court decision

1  regarding Claims 20(O), (P), and (T).  The Arizona Supreme Court summarily denied the
2  petition for review.

3                    **EVIDENCE DEVELOPED IN THE HABEAS PROCEEDINGS**

4        Petitioner has presented expert testimony, based upon, inter alia, the results of
5  neuropsychological testing, suggesting that Petitioner suffers from several psychological
6  conditions: cognitive disorder or impairment; post-traumatic stress disorder (PTSD); poly-
7  substance abuse; attention deficit hyperactivity disorder (ADHD); and a mood disorder.
8  Respondents have countered with expert testimony indicating that the test results and the
9  record as a whole do not support diagnoses of cognitive disorder, PTSD, or a mood disorder.
10 Petitioner's experts further ascribe as a cause of Petitioner's alleged cognitive disorder or
11 impairment a series of head injuries that occurred with some regularity throughout
12 Petitioner's life prior to the date of the instant offenses.

13 **1.    Petitioner's witnesses**

14       At the evidentiary hearing three mental health experts testified for Petitioner: Dr.
15 Potts; Dr. Pablo Stewart, a psychiatrist; and Dr. Alan Goldberg, an attorney and
16 neuropsychologist.  Petitioner's trial counsel, Lee Novak, also testified.  Their findings and
17 testimony can be summarized as follows.

18       <u>Dr. Potts:</u>  As discussed above, Dr. Potts performed a court-ordered psychiatric
19 evaluation of Petitioner in November 1993.  (Ex. 23.)  At the evidentiary hearing, Dr. Potts
20 testified that he had been appointed as an independent expert (RT 3/21/06 at 13); that he was
21 not a mitigation specialist and did not undertake an adequate mitigation investigation but
22 instead performed only a "cursory examination" to obtain a "gross overview" of Petitioner's
23 condition (*id.* at 32, 92); and that he had urged Mr. Novak to obtain neuropsychological as
24 well as neurological testing of Petitioner (*id.* at 60-61).  Dr. Potts acknowledged that when
25 he prepared his report and testified at Petitioner's sentencing hearing he had obtained
26 background information from Petitioner's parents.  (*Id.* at 52-53.)  His report included a
27 "societal and developmental history," which set out information about Petitioner's childhood
28

abuse by his first stepfather, his head injuries and extensive drug abuse, and the role genetic-loading played in Petitioner's mental-health difficulties.  (Ex. 23 at 2-3.)  All of these were factors that the trial court determined to be mitigating.  (ROA 117, 118.)

Dr. Potts acknowledged that he did not diagnose Petitioner with PTSD, or even discuss the condition, although as a psychiatrist he was qualified to make such a diagnosis. (RT 3/21/06 at 66-69.)  Dr. Potts further acknowledged that Petitioner, whose memory was intact, did not provide any information regarding physical abuse by Randy Jones or head injuries resulting from car accidents.  (*Id.* at 79-80.)  Finally, Dr. Potts did not note any "gross" or "obvious" cognitive deficits (*id.* at 49), and estimated that Petitioner's IQ was in the normal range (*id.* at 49-50; Ex. 23 at 3).

Dr. Stewart:  Dr. Stewart evaluated Petitioner in March 2002 and testified on his behalf at the evidentiary hearing.  In his declaration and testimony, Dr. Stewart concluded that Petitioner suffers from cognitive dysfunction; PTSD; poly-substance abuse, which Dr. Stewart described as a product of genetic predisposition and self-medication; and mood disorder NOS (not otherwise specified).  (Ex.1; RT 3/21/06 at 172.)

Dr. Stewart reached his conclusion that Petitioner suffers from cognitive impairment based primarily upon two pieces of data: the low scores Petitioner achieved on standardized tests from the eighth grade (RT 3/21/06 at 175-76), and the results of neuropsychological testing performed by Dr. Goldberg, specifically the gap between Petitioner's performance and verbal IQ scores (*id.* at 177).  With respect to Petitioner's performance on standardized tests, however, Dr. Stewart acknowledged that absenteeism and drug use could have contributed to Petitioner's low scores.  (*Id.* at 211-14.)

Dr. Stewart also offered his opinion regarding the causes of Petitioner's cognitive impairment, among which Dr. Stewart listed pre-natal exposure to chrome, caffeine, and nicotine; childhood physical, sexual, and mental abuse, including emotional and physical abuse by Randy Jones; and cumulative head injuries.  (Ex.1 at 21-27; RT 3/21/06 at 178-87.) However, as Dr. Stewart conceded, the record contains contradictory information regarding

- 10 -

many of these circumstances.   For example, Petitioner's mother reported that, while Petitioner's birth was difficult, he was delivered full-term, weighing seven pounds seven ounces, and thereafter developed normally.  (RT 3/21/06 at 208-09; *see* Ex. 56, Interview with Peggy and Randy Jones, 12/3/01 at 6.)   The record also includes inconsistent information with respect to Randy Jones's treatment of Petitioner and other family members. While Dr. Stewart reports that Jones was extremely abusive, both mentally and physically, to the entire household, elsewhere Petitioner had reported that he came from a good family and was not abused (Ex. 26) and characterized Jones as his "real dad, . . . the only one that has treated me good.  He has never hit me or anything."  (Ex. 14).  Similarly, Petitioner's mother described Randy Jones as controlling but not physically abusive.  (Ex. 56, Interview with Peggy Jones, 12/10/01 at 2, 4, 10, 11.)

Finally, as Dr. Stewart acknowledged, there is no documentation to support Petitioner's claims of multiple head injuries.  (See RT 3/22/06 at 233-34.)   With the exception of the 1983 "mugging," no medical records exist regarding any of the incidents, and the only source corroborating Petitioner's self-report is his mother's account of three head injuries Petitioner suffered as a child and adolescent.  Moreover, although Petitioner has described the 1983 incident as a beating in which he was struck with a two-by-four, suffered convulsions, remained unconscious for three days (*see, e.g.*, Ex. 12 at 2), and was "almost killed" (Ex. 53 at 3), contemporaneous medical records present a very different account.  The records indicate that Petitioner was hospitalized for two days after being found lying unresponsive.  (Ex. 15.)   Petitioner was intoxicated; there "was no apparent accident involved."  (*Id.*)  Initially, Petitioner "appeared to be sleeping" and responded only to physical stimuli; however, after receiving Narcon, a medication that counteracts the effects of intoxication, he responded to questions, denying that he felt any local pain and admitting that he had consumed "many beers."  (*Id.*)  He exhibited "no apparent trauma," and his head was "atraumatic."  (*Id.*)  Further examination revealed only a "minor abrasion and a tender area over the right parietal scalp."  (*Id.*)  The results of neurological exams were "normal."

- 11 -

1   (*Id.*)  His discharge diagnosis listed "head trauma," "alcohol intoxication," and "resolved

2   apparent concussion."  (*Id.*)  Significantly, Petitioner's medical records further reveal that

3   during his subsequent treatment for alcohol abuse, his "[c]ognitive testing was normal." (*Id.*;

4   *see* RT 3/23/06 at 401.)

5       Dr. Stewart also concluded that Petitioner suffers from PTSD.  In his report, Dr.

6   Stewart discussed only the first of the four criteria that must be satisfied to reach a diagnosis

7   of PTSD according to the DSM-IV; i.e., that Petitioner had experienced a traumatic event,

8   having witnessed and been the victim of abuse during his childhood.[5]  (Ex. 1 at 27; *see* RT

9   3/22/06 at 237.)  In his testimony, however, Dr. Stewart insisted that Petitioner also met the

10  remaining criteria – re-experiencing of the trauma, avoidance, and hyperarousal.  (RT

11  3/22/06 at 240.)  Although he did not attempt to determine whether Petitioner experienced

12  these conditions at the time of the murders, Dr. Stewart testified that the effects of PTSD

13  were present in all aspects of Petitioner's life.  (RT 3/22/06 at 237-43.)  Thus, according to

14  Dr. Stewart, Petitioner was "acting under the effects of PTSD" when he beat Weaver and Ms.

15  Gumina to death with a baseball bat.  (Ex. 1 at 32.)  Dr. Stewart also adopted Dr. Foy's

16  conclusions regarding PTSD.[6]  As Respondents note, however, it is unclear whether Dr. Foy

17  actually diagnosed Petitioner with PTSD; for example, in his report he described his finding

18  as "probable chronic PTSD" (Ex. 5 at 10), and in his deposition Dr. Foy characterized his

19

20

21       [5]     "DSM-IV" refers to the Diagnostic & Statistical Manual of Mental Disorders

22  (4th ed. 1994).

23       [6]     Two of Petitioner's experts prepared reports but did not testify at the
    evidentiary hearing: psychologist David Foy and neuropsychologist Shoba Sreenivasan. Dr.

24  Foy conducted a psychosocial history and evaluation of Petitioner. (Ex. 5.)  He concluded
    that Petitioner suffers from PTSD, Polydrug Abuse, Depressive Disorder, as well as

25  compromised cognitive and emotional functioning and learning deficits. (*Id.*)   Dr.
    Sreenivasana did not perform any tests but prepared a report, based upon his review of the

26  record and Dr. Goldberg's test results, concluding that Petitioner suffered from long-term

27  poly-substance abuse as well as compromised cognitive functioning due to early onset of
    substance abuse and the cumulative impact of repeated head traumas. (Ex. 8.)

28

- 12 -

opinion only as suggesting that "there's a very high probability that [Petitioner] would be diagnosed by anyone with PTSD" (RT 3/22/06 at 247-48).   Finally, Dr. Stewart acknowledged that Petitioner's conduct at the time of the murders could also be attributed to substance abuse, and that he could not determine the degree to which Petitioner's behavior was the result of PTSD as opposed to the use of methamphetamine and alcohol.  (RT 3/22/06 at 243–44.)

Dr. Stewart also diagnosed Petitioner with a mood disorder NOS. (Ex. 1 at 24.)  This diagnosis is based upon Petitioner's mental-health history, which includes a suicide attempt, psychiatric treatment using the drug lithium, and Arizona DOC records indicating that Petitioner was diagnosed with a bipolar disorder and treated with mood-stabilizing drugs and anti-psychotics.   (RT 3/21/06 at 201-06.)   Dr. Stewart acknowledged, however, that Petitioner's DOC records discuss Petitioner's depressive symptoms but include no direct indications that Petitioner exhibited symptoms of mania.  (*Id.* at 260.)

Also included in Dr. Stewart's declaration is information detailing Petitioner's allegation that he had been sexually assaulted by his grandfather. (Ex. 1 at 15, 22.)  The source of this information is Dr. Foy's report, which indicates that Petitioner suffered severe sexual abuse for a period of five years, from age nine to fourteen.  (RT 3/22/06 at 234.)  However, Randy Jones and Petitioner's mother "never saw any indication that [Petitioner] may have been sexually abused by anyone, nor were they aware of any sexual perpetrators in the family."  (Ex. 56, Interview with Peggy and Randy Jones, 12/10/01 at 6.)  Dr. Stewart conceded that the information concerning sexual abuse was most likely based upon Petitioner's self-report to Dr. Foy.  (RT at 3/22/06 at 234-35.)

Finally, in his declaration Dr. Stewart concluded that, "The result of these mental illnesses, biological, environmental, social and other compromising factors, culminated in, at the time of the murder, an impairment in Danny's capacity to appreciate the wrongfulness

- 13 -

of his actions and/or to conform his conduit to that required by law."[7] (Ex. 1 at 32.)

Dr. Goldberg:  Dr. Goldberg performed a neuropsychological evaluation of Petitioner in February 2002 and testified at the evidentiary hearing.  In his declaration, Dr. Goldberg offered "diagnostic impressions" of "attention deficit disorder and learning disability." (Ex. 12 at 7; *see* RT 3/22/06 at 303.)   These impressions are based upon the results of neuropsychological examinations, including, most significantly, the difference in Petitioner's performance and verbal IQ scores as well as subtest "scatter" within test results from each category.  (*See* RT 3/22/06 at 284-85.)  Dr. Goldberg testified that such scatter is seen in only five percent of the population.  (*Id.* at 284, 338.)  Dr. Goldberg further noted a "significant change" for the worse in Petitioner's grades from the first to the eighth grade.  (*Id.* at 284.) According to Dr. Goldberg, a bipolar disorder "can also be diagnosed," as well as "[s]ome 'soft' neurological signs" that might be "sequelae of repeated blows to the head." (Ex. 12 at 7.)  Based upon these impressions, Dr. Goldberg opined, with respect to the issue of

---

[7]       In the Conclusions Section of his declaration Dr. Stewart went even further, including a paragraph endorsing Petitioner's account of the crimes.  (Ex. 1 at 31-34.) According to Dr. Stewart, "Danny's psychological profile supports the events as described by Danny on the night of the crimes, including Frank's responsibility for Tisha Weaver's murder."  (*Id.* at 33.)  In assessing Dr. Stewart's credibility, the Court takes into account his willingness to present an opinion on a factual issue which concerns only the guilt phase of the trial and which was resolved, with a result contrary to that reached by Dr. Stewart, by the jury, the trial court, and the Arizona Supreme Court.

       The Court also takes note of Dr. Stewart's reliance on the following factors to support his assertion that Petitioner did not kill Tisha.  First, Dr. Stewart explains, without reference to corroborating sources, that Petitioner "was by all accounts a good step-father and is now a good father." (*Id.* at 32.)  Dr. Goldberg reports, by contrast, that Petitioner "had a child with a girlfriend subsequent to his divorce.  This child is now 9 years old, and he has never met her."  (Ex. 12 at 2.)  Second, Dr. Stewart states that he believes Petitioner's version of his activities on the night of the murders because Petitioner "has a history of submissive, almost child-like behavior, against older males."  (Ex. 1 at 32-33.)  Yet in the same section of his declaration, Dr. Stewart observes that Petitioner "at least twice in his young life defended himself in a life-threatening situation with a baseball bat."  (*Id.* at 32.)  In these instances, Petitioner is alleged to have responded to abuse from adult males not in a submissive manner but by confronting them and threatening them with violence.

premeditation, that "it is unlikely that this man would've been capable of violent acts without the influence of drugs and alcohol" and that "[t]his would be quite different from methodically carrying out criminal activity with intention, and after reflection." (*Id.* at 8.)

In his testimony, Dr. Goldberg acknowledged that many of Petitioner's scores on the neuropsychological tests were in the average or above-average range (RT 3/22/06 at 309-14, 321-23); that Petitioner's full-scale IQ score – 97 – is normal (*id.* at 321); that the decline in Petitioner's grades from elementary to high school could be attributable to drug use, absenteeism, and lack of interest as well as to cognitive impairment (*id.* at 334-35); that, with the exception of the "mugging" while Petitioner was in the Marines, there was no medical documentation of any of Petitioner's reported head injuries, and that the information that Petitioner had been unconscious for three days after the "mugging" was based upon his self-report rather than the contemporaneous records of the incident (*id.* at 330-34). Dr. Goldberg also acknowledged that, despite the voluminous record documenting the extensive efforts to evaluate Petitioner's mental status, and despite the recommendations from Dr. Potts in 1993 and from Dr. Goldberg in 2002, he, Dr. Goldberg, was not aware that Petitioner had ever been subjected to any neurological testing. (*Id.* at 336-37.) Dr. Goldberg also conceded that Petitioner's rating of "severely depressed," as scored on the Beck Depression Inventory, might reflect a normal emotional response to life as a death row prisoner. (*Id.* at 319.)

Lee Novak:  Trial counsel Novak testified that he did not seek appointment of a mitigation specialist. (RT 2/21/06 at 107.) According to Novak, at the time of Petitioner's trial, it was not "common practice" in Mohave County to employ a mitigation expert, and in any case there was no funding available for such an appointment. (RT 3/21/06 at 150.) He indicated, however, that co-counsel, Ms. Carty, and his investigator, Austin Cooper, gathered information about Petitioner's background. (*Id.* at 107-08.) He testified that funding through the Public Defender's Office was limited and that his superior advised him to seek funding for experts from the trial court. (*Id.* at 110.) As a result of Novak's requests, the court authorized limited funding for a crime-scene investigator and for Dr. Sparks, the

addictionologist who testified at the guilt stage of trial.  (*Id.* at 110-14.)

Novak also testified that Dr. Potts, although appointed and funded by the trial court, in fact served as the equivalent of Petitioner's mitigation specialist.  Novak explained that Dr. Potts "did not act as a neutral, detached court-appointed expert."  (RT 3/21/06 at 121.)  Instead, Dr. Potts "indicated that his role was going to be to help us." (*Id.*)  In fact, Dr. Potts "actively assisted developing mitigation, planning strategy" (*id.*); he urged Novak to move for a continuance for additional neurological testing, and advised Novak to cite the case of *State v. Stuard*, 176 Ariz. 589, 863 P.2d 881 (1993) in support of the motion (*id.* at 123).  According to Novak, his discussion of strategy with Dr. Potts the night before Dr. Potts testified at the sentencing hearing "was more like meetings I've had since with aggravation/mitigation experts who are part of our defense team."  (*Id.* at 122-23, 125.)

**2.      Respondents' witnesses**

Respondents called three experts to testify at the evidentiary hearing: Dr. Steven Herron, a psychiatrist formerly employed by the Department of Corrections; Dr. Anne Herring, a neuropsychologist; and Dr. John Scialli, a psychiatrist.  Their findings and testimony can be summarized as follows.

Dr. Herron:    Dr. Herron treated Petitioner from 2003 to 2005.   The treatment consisted primarily of the management of Petitioner's medication. (RT 3/23/06 at 362, 374.)  Based upon a working diagnosis of bipolar disorder, Dr. Herron treated Petitioner for depression and anxiety.  (*Id.* at 363-64.)  Dr. Herron stated that both depression and anxiety are common among death-row inmates.  (*Id.* at 364.)  He testified that he believed the diagnosis of bipolar disorder was reasonable, although he did not observe any manic or hypomanic episodes.  (*Id.* at 363.)  Finally, Dr. Herron detected no signs of neurological dysfunction, cognitive impairment, or PTSD, though he could not rule those conditions out.  (*Id.* at 366-68, 375-76.)

Dr. Herring:  Dr. Herring, a clinical neuropsychologist, interviewed and tested Petitioner and prepared a report dated November 2, 2005. (Ex. 51.)  Based upon the results

1   of the tests she performed and her review of test results obtained by Dr. Goldberg, Dr.

2   Herring concluded that Petitioner does not suffer from cognitive impairment or ADHD. (*Id.*

3   at 7-8; *see* RT 3/23/06 at 443.)

4           Dr. Herring did not repeat the tests Dr. Goldberg administered on which Petitioner

5   performed in the average or above-average range. (RT 3/23/06 at 404-05.) She administered

6   tests designed to measure "executive function"; according to Dr. Herring, the results of such

7   tests would indicate whether Petitioner suffers from "even subtle cognitive dysfunction as

8   a result of head injuries." (*Id.* at 405.)   On two of these tests, the Category Test and the

9   Wisconsin Card Sorting Test, Petitioner performed in the "well above average range." (Ex.

10  51 at 6.)   On tests implicating another category of executive functioning ("working

11  memory/divided attention"), Petitioner scored in the low-average to average range, with one

12  exception. (RT 3/23/06 at 408-11, 431; Ex. 51 at 6-7.)   On that test, Petitioner scored in the

13  borderline-impaired range for shorter delay intervals. (*Id.*)   However, his performance

14  improved to the average range for the longer, more difficult delay intervals, suggesting to Dr.

15  Herring that Petitioner's "attention and working memory really are intact." (RT 3/23/06 at

16  431.)

17          On other tests measuring memory, Petitioner's performance "fluctuated somewhat but

18  revealed largely intact abilities." (Ex. 51 at 5.)   Petitioner's scores were lower on tests

19  measuring immediate as opposed to delayed recall. (*Id.*; RT 3/23/06 at 413-16; Ex. 12.)

20  According to Dr. Herring, this "atypical presentation," by which Petitioner was able to recall

21  information more successfully after a delay, is inconsistent with memory loss due to brain

22  injury and may indicate that Petitioner experienced anxiety or was distracted during the

23  testing. (RT 3/23/06 at 415-16.)   On tests measuring attention, Petitioner scored in the

24  average to very superior range, with one exception, a test administered by Dr. Goldberg but

25  "not compared to any norms." (*Id.* at 421.)   While acknowledging that these tests are not

26  "differentially diagnostic" of ADHD, Dr. Herring testified that the results Petitioner achieved

27  are not consistent with a diagnosis of attention deficit. (*Id.* at 423.)   In this context Dr.

28

1   Herring also noted that there was nothing in the record suggesting that Petitioner displayed
2   symptoms of ADHD prior to the age of seven, one of the criteria for a diagnosis of ADHD;
3   to the contrary, the record indicated that Petitioner was a good student and that his teachers
4   "loved" him, the latter not being a phenomenon characteristic of children with ADHD.[8]  (*Id.*)

5          To supplement the testing performed by Dr. Goldberg and to measure additional
6   aspects of Petitioner's executive ability, Dr. Herring administered a series of subtests of the
7   Delis-Kaplan Executive Functioning System.  (RT 3/23/06 at 434-35.)  To measure cognitive
8   flexibility, Dr. Herring administered the Verbal Fluency and Design Fluency tests.  On the
9   former, analogous to the Controlled Word Association Test administered by Dr. Goldberg
10  on which Petitioner achieved low-average scores, Petitioner's scores were all in the average
11  range.  (*Id.* at 436.)  On the latter, Petitioner's scores were in the average to high-average
12  range.  (*Id.*)  On a test designed to measure "inhibitory capacity" and "impulse control,"
13  Petitioner performed in the borderline-impaired range; however, in another test measuring
14  the same domain, Petitioner's score placed him in the high-average range.  (*Id.* at 436-37; Ex.
15  51 at 7.)  With respect to the latter test, Dr. Herring testified that it was significant that in
16  completing the test Petitioner obeyed all of the rules; Dr. Herring noted that subjects with
17  ADHD or frontal lobe damage find it difficult to perform the test without breaking the rules.
18  (*Id.* at 437; Ex. 51 at 7.)  To measure Petitioner's verbal thinking and abstract reasoning
19  abilities, Dr. Herring administered a "proverb-interpretation" test, on which Petitioner scored
20  in the high-average range.  (*Id.*)

21         Petitioner's scores on achievement tests administered by Dr. Goldberg ranged from
22  low average (math) to average (spelling) and high average (passage comprehension).  (*Id.*
23  at 425.)  On reading tests administered by Dr. Herring, Petitioner performed at the average
24  level when compared with his age peers and the low-average level in comparison with his
25

26  _____

27        [8]      The record indicates that Petitioner's parents "did not consider him to have any
28  periods of hyperactivity."  (Ex. 56, Interview with Peggy and Randy Jones, 12/3/01 at 11.)

education peers.  (Ex. 51 at 6; RT 3/23/06 at 433.)  His math performance was in the lower half of the average range with respect to his age peers and in the borderline and low-average range with respect to his education peers.  (*Id.*)

On tests assessing visuospatial organization and construction, administered by Dr. Goldberg, Petitioner's performance was superior.  (Ex. 51 at 5; RT 3/23/06 at 426.)  Dr. Herring administered a test requiring Petitioner to copy a complex drawing and then draw it from memory.  Petitioner's performance in copying the figure was moderately impaired but did not "suggest that there was a major distortion in his visuospatial processing."  (RT 3/23/06 at 432.)

On tests measuring sensory and motor abilities, Petitioner performed in the average range for fine motor speed and manual dexterity but in the borderline-impaired range on the TPT, a "complex perceptual motor task."  (*Id.* at 5-6; RT 3/23/06 at 427-29.)  The latter test measures several cognitive domains, including memory and speed of information-processing, as well as tactile perception.  (*Id.* at 428.)  Taking into account Petitioner's performance on other tests measuring cognitive ability, Dr. Herring opined that Petitioner's low score on the TPT reflected a difficulty with his tactile perceptual abilities rather than a problem with processing information.  (*Id.*)

In her testimony Dr. Herring addressed the bases for Dr. Goldberg's conclusion that Petitioner suffers from cognitive deficiency.  She explained that a child's grades in school can be affected by a variety of factors unrelated to cognitive ability.  (RT 3/23/06 at 391-92.)  She further noted that Petitioner's scores on his eighth grade standardized achievement tests, which placed him in the average or low-average range (*id.* at 393), were not low enough to meet the definition of cognitive impairment (*id.* at 400).

With respect to the gap in Petitioner's performance and verbal IQ scores, Dr. Herring testified that such a disparity, while significant, is not "uncommon," with eighteen-point or greater disparities in scores occurring in "ten percent of normal people."  (*Id.* at 418.)  More importantly, Dr. Herring noted that Petitioner's higher score occurred on the performance

subtest, which measures speed and is "sensitive to any disorder that impairs mental processing," whereas his lower score occurred on the verbal subtest, which, to a greater extent than performance IQ, "assesses past learned information." (*Id.*) Therefore, according to Dr. Herring, "the fact that [Petitioner] did so much better on the performance IQ than the verbal IQ is probably more suggestive of the fact that he did not do well in school than that he is cognitively impaired, which would tend to slow people up, slows their processing speed and slows their memory." (*Id.* at 418-19.)

Finally, in addition to neuropsychological tests, Dr. Herring, like Dr. Goldberg, administered the Beck Depression Inventory II. (*Id.* at 442.) Petitioner's score placed him "in the range of normal mood." (*Id.*) This represents a stark contrast with the result reported by Dr. Goldberg, who, as noted above, found Petitioner to be severely depressed.

Although Petitioner's test results included a few scores in the impaired range on individual tests or subtests, Dr. Herring explained that these low scores were "outliers"; they could not form the basis for a finding of cognitive disorder because they did not consistently occur in any one cognitive domain. (*Id.* at 470-72, 478-79.) Dr. Herring observed that, given the number of tests Petitioner was subjected to, sixty percent of the population would have two or more test scores in the impaired range. (*Id.* at 470.)

Dr. Scialli:  Dr. Scialli examined Petitioner on October 28, 2005, and prepared a "Psychiatric Examination Report to Determine Mental State at Time of Alleged Offense," dated November 10, 2005. (Ex. 53.) Dr. Scialli testified that, based on his psychiatric evaluation of Petitioner and a review of all the records, he could diagnose Petitioner as suffering from the following conditions at the time of the murders: alcohol, amphetamine, and cannabis dependence, and ADHD, residual type. (RT 3/23/06 at 511.)

Dr. Scialli disputed the diagnoses of Petitioner's experts.  He disagreed with the diagnosis of PTSD, observing that Petitioner's experts based their conclusions exclusively on a finding that Petitioner had experienced a traumatic event; they did not, according to Dr. Scialli, consider the remaining factors necessary to complete a diagnosis of PTSD. (RT

1   3/23/06 at 496-99.)  Dr. Scialli further noted that during his examination of Petitioner there

2   was no indication that Petitioner had "re-experienced" the traumatic event at the time of the

3   murders.  (*Id.* at 499.)

4       Dr. Scialli testified that none of the experts had diagnosed Petitioner with cognitive

5   disorder as defined by the DSM-IV.  (*Id.* at 500.)  Dr. Scialli explained that phrases such as

6   "cognitive dysfunction" or "cognitive impairment" are not diagnostic definitions but instead

7   are used "idiosyncratically" as "terms of art" with no fixed meaning  (*Id.* at 499-500.)

8   According to Dr. Scialli, Petitioner could not be classified under any of the categories of

9   cognitive disorder established by the DSM-IV; i.e., no expert had diagnosed Petitioner with

10  delirium, dementia, amnesiac disorder, or with cognitive disorder NOS. (*Id.* at 500-02.)

11      Dr. Scialli also concluded that Petitioner did not suffer from bipolar disorder.  Most

12  significant to this finding was the absence of evidence of manic or hypomanic symptoms.

13  (*Id.* at 504.)  Dr. Scialli testified that Petitioner's description of his "highs and lows"

14  "sounded like having an average day as opposed to a down-and-out day, and that's not mania

15  or hypomania."  (*Id.*)  In addition, the fact that Petitioner was prescribed, and responded

16  positively to, lithium, did not indicate to Dr. Scialli that Petitioner suffers from bipolar

17  disorder, because the drug is successfully used to treat a number of other conditions.  (*Id.* at

18  502-03.)

19      Dr. Scialli diagnosed Petitioner with residual symptoms of ADHD.  (*Id.* at 504-05.)

20  He testified, however, that there is no link between ADHD and violent behavior.  (*Id.* at 505.)

21  He further testified that, had he been aware of Dr. Herring's testimony on the issue of ADHD

22  before he prepared his report, he might have "come to a different conclusion."  (*Id.* at 512.)

23  In any event, the presence or absence of ADHD, residual type, is, in Dr. Scialli's opinion, a

24  "very minor point," because the condition is not related to the offenses.  (*Id.*)

25      Finally, Dr. Scialli's report discusses the impact of the new evidence obtained during

26  the habeas proceedings on the issues raised in Petitioner's claims.  (Ex. 53 at 8-10.)  First,

27  Dr. Scialli found that Dr. Potts was qualified to evaluate Petitioner for neurological disorders

28

and organic mental illness.  (*Id.* at 8.)  Dr. Scialli also testified that Dr. Potts's call for "sophisticated neurological testing" could not have been interpreted as a request for a neuropsychological examination.  (RT 3/23/06 at 496.)  Dr. Scialli also opined that the neuropsychological testing performed during these habeas proceedings fails to provide any information in addition to that which was included in Dr. Potts's 1993 report and testimony at sentencing.  (Ex. 53 at 8.)  Dr. Scialli also wrote and testified that Petitioner's experts failed to establish a stronger nexus between Petitioner's alleged disorders and the murders than the connection made by Dr. Potts at sentencing.  (*Id.*)

**3.    Findings based on the new evidence**

Faced with conflicting diagnoses resulting from a "latter day battle of the experts," *Sims v. Brown*, 425 F.3d 560, 584 (9th Cir. 2005), the Court necessarily takes into account the credibility of the parties' witnesses.  *Cf. Ford v. Wainwright*, 477 U.S. 399, 415 (explaining the value of cross-examination in assessing "inconsistent" psychiatric evidence). Testimony elicited during the hearing indicated that Dr. Stewart's forensic work is done "primarily for the defense" (RT 3/22/06 at 231-32), and that Dr. Goldberg has never been retained by the prosecution in a capital case and presently has a "working relationship" with the Federal Public Defender's Office (*id.* at 306).  By contrast, Drs. Herring and Scialli have offered testimony on behalf of both the State and criminal defendants or habeas petitioners, with Dr. Scialli having been retained with equal frequency by the defense and the prosecution.[9]  (*Id.* at 388-89, 486.)  With these considerations in mind, the Court makes the

---

[9]    In previous appointments Drs. Herring and Scialli addressed some of the key issues present in Petitioner's case. Dr. Herring testified on behalf of the petitioner in *Correll v. Stewart*, 2-CV-87-1471-PHX-SMM.  At an evidentiary hearing on Correll's IAC claim, Dr. Herring testified that neurological testing indicated that Correll suffered from brain dysfunction, problems with impulse control, and possible prefrontal lobe impairment. (*See* Mem. of Decision and Order dated 3/5/03.)  In *State v. Stuard*, 176 Ariz. 589, 608, 863 P.2d 881, 900 (1993), Dr. Scialli, although retained by the State, testified that the defendant's boxing career could have caused brain damage and that the resulting mental impairment was causally related to the murders; according to Dr. Scialli, Stuard, suffering from dementia,

following findings regarding the factual bases of Petitioner's claims of IAC at sentencing.

Cognitive impairment:[10] The Court finds that Petitioner has not shown that he suffers from cognitive impairment. This finding is based upon the reports and testimony of Drs. Herring and Scialli, the test results offered by both parties, and the Court's review of the entire record.

Petitioner has not presented persuasive evidence regarding either the existence or the cause of his alleged cognitive impairment.  In making their diagnosis of cognitive impairment, Petitioner's experts relied upon Petitioner's school performance, both his grades and his scores on standardized tests; the discrepancy in his performance and verbal IQ scores; and the results of other neuropsychological tests.  As discussed above, alternative explanations exist with respect to Petitioner's declining school performance, including absenteeism, family stresses, substance abuse, and lack of motivation.  Moreover, as Dr. Herring testified, Petitioner's standardized test scores were within the average range and do not, by themselves, suggest impairment.  The gap between Petitioner's IQ scores, while notable, is not uncommon, and the fact that Petitioner scored higher on the performance subtest militates against a finding of impairment, as does the fact that Petitioner's overall IQ is solidly in the average range. Finally, in the vast majority of instances Petitioner's scores on neuropsychological tests were in the average range or above.  The few scores that fell in the impaired range did not implicate any particular cognitive domain, suggesting that they were aberrations and not indicative of impairment.

The experts ascribed as the primary cause of Petitioner's cognitive impairment a series

"reacted suddenly and overwhelmingly when he confronted and was confronted by his victims." *Id.* at n.12.

[10]     The Court uses the term cognitive "impairment" as synonymous with "dysfunction," recognizing both as terms of art describing a condition distinct from cognitive disorder, a condition recognized by the DSM-IV but which none of the experts diagnosed in Petitioner.

of head injuries.  With the exception of the 1983 "mugging," there is no medical documentation to corroborate any of these injuries.  In addition, the dates and details – and even the occurrence – of the injuries, as reported by Petitioner and his family, are inconsistent and hence difficult to credit.[11]  This difficulty is compounded by the contrast between Petitioner's account of the 1983 incident, in which he was mugged, struck by a two-by-four, and left unconscious for three days, and the contemporaneous medical records, which indicate that Petitioner was discovered passed out or asleep from the effects of intoxication, that he responded upon being administered medication that counteracted those effects, that he suffered no neurological damage and his only injury was a small abrasion, and that if he suffered a concussion it was "resolved" upon his discharge.  In any event, even if Petitioner's self-reported head injuries did occur, they did not, as discussed above, result in cognitive impairment.

Post-traumatic Stress Disorder:  The Court finds that Petitioner has not shown that he suffered from PTSD at the time of the murders.  The Court reaches this conclusion based

_____

[11]  A complete list of the head or brain injuries alleged by Petitioner and referred to in the record includes, in chronological order: prenatal exposure to neurotoxins in Petitioner's mother's workplace (*see, e.g.,* Ex. 1 at 25); beatings of his pregnant mother by his father (*id.* at 7); strangulation by the umbilical cord while in utero and injuries from use of forceps at delivery (*id.* at 7, 13); beatings to the head at age three by Petitioner's first step-father (*id.* at 8-9; Ex. 8 at 2); a fall off a slide (or a blow from his stepfather) at age five-and-half, six, or seven, which left Petitioner unconscious for "approximately twenty minutes" (Ex. 51 at 2; *see, e.g.*, Ex. 1 at 9, 21); a motor vehicle accident at age ten which left Petitioner unconscious (Ex. 53 at 2); a fall from a roof at age nine, ten, eleven, or thirteen, which rendered Petitioner unconscious for a "couple of minutes"(Ex. 53 at 3) or five minutes to ten minutes (Ex. 1 at 14), or did not result in loss of consciousness (Ex. 51 at 2); another fall, off a second-floor scaffold or roof, at age fifteen or sixteen, leaving Petitioner unconscious for three or four minutes (*see, e.g.,* Ex. 53 at 4) or not resulting in unconsciousness (Ex. 51 at 2); a fight in high school in which Petitioner was "knocked out" (Ex. 8 at 2; Ex. 12 at 2); the 1983 "mugging" (*see, e.g.,* Ex. 12 at 2); a fight at a wedding in 1985, which left Petitioner unconscious for "more than five minutes" (Ex. 53 at 4); "at least" three car accidents as an adolescent or young adult, all producing head injuries and unconsciousness (Ex. 1 at 21); and fights in Nevada bars (*see, e.g.,* Ex. 12 at 2).

1   upon the fact that none of Petitioner's experts completed an appropriate diagnosis using all
2   of the criteria set forth in the DSM-IV; instead, their reports focused simply on the presence
3   of the first criterion, the experience of a traumatic event.  Both Dr. Stewart and Dr. Foy failed
4   to draw any connections between the traumatic events Petitioner experienced in his
5   childhood and the remaining PTSD criteria.  While Dr. Stewart testified that Petitioner's
6   condition satisfied the remaining criteria, he acknowledged that he never discussed with
7   Petitioner the effect of those criteria on Petitioner's conduct at the time of the murders.  (*Id.*
8   at 236.)  Dr. Stewart also acknowledged that Petitioner's conduct during the murders could
9   be attributed to his use of methamphetamine and alcohol, and that he could not determine
10  with certainty the extent to which PTSD, as opposed to drugs and alcohol, caused Petitioner's
11  behavior.  (*Id.* at 243-44.)

12          Attention Deficit/Hyperactivity Disorder:  The Court finds that at the time of the
13  crimes Petitioner suffered from ADHD, residual type.  The Court finds, however, based upon
14  Dr. Scialli's testimony (RT 3/23/06 at 512), that the condition is unrelated to violent behavior
15  and, therefore, the fact that Petitioner suffered from the condition does not serve as
16  persuasive mitigation evidence.

17          Mood disorder:  The Court finds that the evidence does not support a determination
18  that Petitioner suffers from a major affective disorder, such as bipolar disorder.  Specifically,
19  the record does not show that Petitioner has experienced episodes of mania or hypomania.
20  The record and the findings of the experts support a determination that Petitioner may suffer
21  from a chronic, low-level mood disorder such as dysthymia.  Again, the Court does not
22  consider this to be persuasive evidence in mitigation.  None of the experts suggested a causal
23  relationship between the condition and Petitioner's conduct during the crimes.

24          Substance abuse:  The Court finds, based upon the undisputed testimony, that at the
25  time of the crimes Petitioner suffered from dependence on alcohol, amphetamine, and
26  cannabis.
27
28

**GOVERNING LAW**

Because the PCR court denied relief on Claims 20(O), (P), and (T) based on the substantive issues, the claims were "adjudicated on the merits" and are subject to the standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA).

**1.    Standard for habeas relief**

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

With respect to § 2254(d)(1), the Supreme Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Application of these standards presents difficulties when the state court decided the

merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.

## 2.   Clearly established federal law

The parties agree that *Strickland v. Washington*, 466 U.S. 668 (1984), is the relevant clearly established Supreme Court authority. *Strickland* requires a petitioner alleging ineffectiveness of counsel to show that counsel's performance was deficient and that the deficiency prejudiced his defense. *Id.* at 687.

To establish deficient performance under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness "under prevailing professional norms." *Id.* at 687-88. As Petitioner correctly notes, failure to adequately investigate and present mitigating evidence at sentencing may constitute deficient performance. *See Wiggins v. Smith*, 539 U.S. 510 (2003).

To establish prejudice under *Strickland*, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Under the prejudice prong, "an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

The Supreme Court has emphasized that assessing prejudice in the context of capital sentencing requires the reviewing court to "reweigh the evidence in aggravation against the

totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  Thus, in assessing Petitioner's allegations of prejudice, this Court must "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98.  To establish prejudice, a petitioner must show there "is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  In making such a determination, the Court is further guided by the principle that a sentencing decision that is supported by "overwhelming record support" is less likely to be affected by deficient performance than a decision that is weakly supported by the record. *Strickland*, 466 U.S. at 696.

The Ninth Circuit has elaborated on the standards governing a habeas court's review of a claim of IAC at sentencing, emphasizing that the sentencing court's decision "will stand if supportable" and that "[r]eviewing courts . . . conduct their review to see if the decision can be supported, rather than to see if they would have reached the same decision." *Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998).  The Court of Appeals further explained that:

> In assessing prejudice in a case like this one, we are presented with a particularly difficult practical and jurisprudential question because we are not asked to imagine what the effect of certain testimony would have been upon us personally.  We are asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial.  Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer.

*Id.*

## ANALYSIS

Claims 20(O), (P), and (T) allege that Novak rendered ineffective assistance of counsel ("IAC") at sentencing.  In Claim 20(O), Petitioner asserts that he was denied

1  effective assistance of counsel when Novak failed to secure the appointment of "partisan"

2  mental health experts, in the form of a neuropsychologist and neurologist who could have

3  revealed Petitioner's "neurological disorders and organic mental illness." (Dkt. 54 at 126.)

4  Claim 20(P) alleges that Novak's failure to make a timely motion seeking neurological and

5  neuropsychological testing constituted IAC. (Dkt. 54 at 126.) In Claim 20(T), Petitioner

6  alleges that his right to effective assistance of counsel was denied due to Novak's failure to

7  present additional mitigation evidence focusing on Petitioner's abusive childhood and the

8  effects of his head trauma and drug abuse. (Dkt. 54 at 129.) Petitioner alleges that this

9  information could have been established through testimony of his ex-wife, friends, family

10 members, and former drug counselors. (*Id.*)

11      Petitioner alleges that the state court's denial of his IAC claims constituted an

12 unreasonable application of *Strickland*. (Dkt. 66 at 70, 71, 76.) The PCR court did not

13 specifically cite the authority upon which it relied in denying relief on the claims, but the

14 parties predicated their arguments on *Strickland*. It is reasonable to assume, therefore, that

15 the PCR court made its decision pursuant to *Strickland*. However, the rationale it applied in

16 doing so cannot be discerned. Therefore, this Court independently reviews the record before

17 the PCR court, in conjunction with its *de novo* review of new evidence presented at the

18 evidentiary hearing, to assess whether the state court, in denying Petitioner's IAC claims,

19 "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v.*

20 *Cone*, 535 U.S. 685, 698-99 (2002).

21      For the reasons set forth below, the Court has determined that it is unnecessary to

22 assess the quality of counsel's performance under the first prong of *Strickland* because

23 Petitioner has failed to meet his burden under the second prong, which requires that he

24 "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. As the *Strickland* Court

25 explained, "A court need not determine whether counsel's performance was deficient before

26 examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

27 *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of

28

1   sufficient prejudice . . . that course should be followed"); *see Smith v. Robbins*, 528 U.S. 259,

2   286 n.14 (2000); *Fields v. Brown*, 431 F.3d 1186, 1203-04 (9th Cir. 2005).

3   The Court has assessed prejudice with respect to Petitioner's sentencing-stage IAC

4   claims by reevaluating Petitioner's sentence in the light of the evidence introduced in these

5   habeas proceedings.  The Court concludes that the new information is largely inconclusive

6   or cumulative: it "barely . . . alter[s] the sentencing profile presented to the sentencing

7   judge."  *Strickland*, 466 U.S. at 700.  Petitioner has failed, therefore, to affirmatively

8   demonstrate a reasonable probability that this additional information would alter the trial

9   court's sentencing decision after it weighed the totality of the mitigation evidence against the

10  strong aggravating circumstances proven at trial.  Therefore, Petitioner is not entitled to

11  habeas relief on the following claims.

12  **1.    Claim 20(O)**

13  The PCR court's order denying this claim was not objectively unreasonable under

14  *Strickland*.  After independently reviewing the record, the Court concludes that counsel's

15  failure to seek the appointment of a mental health expert in a more timely manner did not

16  prejudice Petitioner.  This is because Dr. Potts served as a de facto defense expert at

17  sentencing and also because, as discussed below with respect to Claim 20(P), the results of

18  subsequent examinations performed by the parties' mental health experts have not

19  established a more-persuasive case in mitigation than that presented through the report and

20  testimony of Dr. Potts.  Therefore, even if Novak had persuaded the trial court to appoint a

21  partisan mental health expert, there is not a reasonable probability that the court, presented

22  with the report of a defense expert in addition to Dr. Potts, would have imposed a life

23  sentence rather than the death penalty.

24  At the evidentiary hearing Novak testified that, after speaking with Dr. Potts and

25  reviewing his report, he came to regard Dr. Potts as a mitigation expert and a member of the

26  defense team.  (RT 121-22, 134-35, 151.)  Novak worked closely with Dr. Potts.  He

27  provided Dr. Potts with medical and military records and the trial testimony of Dr. Sparks.

28

1    (*Id*. at 47-48, 141-44.)  He also provided Dr. Potts with information relating to Petitioner's

2    family history, and Dr. Potts spoke with Petitioner's mother and step-father about Petitioner's

3    history of drug use, his early childhood, and his head injuries. (RT 3/21/06, at 46-47.)  In

4    turn, Dr. Potts actively assisted Novak in developing a case in mitigation.  As noted above,

5    it was Dr. Potts who recommended that Novak seek a continuance to obtain additional

6    neurological testing. (RT 3/21/06, at 121-23, 125.)

7         In his report and during his testimony at sentencing, Dr. Potts offered accounts of

8    Petitioner's chaotic and abusive childhood, including details of the abuse Petitioner suffered

9    at the hands of his first step-father.  (Ex. 23 at 2; RT 12/9/93 at 80-83.)  Dr. Potts reported

10    that Petitioner's mother told him that Petitioner's personality changed when he was around

11    fourteen years old, and that he started to get into trouble in his early teens, around the same

12    time he started drinking alcohol and experimenting with drugs. (Ex. 23 at 4; RT 3/21/06 at

13    53.)  Dr. Potts referred in his report to three head injuries Petitioner suffered as a child (Ex.

14    23 at 3), and in his testimony at the sentencing hearing he described two additional incidents

15    (RT 12/8/93 at 77-78, 90-91).

16         Dr. Potts's findings and testimony were clearly favorable to Petitioner.  He concluded

17    in his report that Petitioner's ability to conform his conduct to the requirements of the law

18    was impaired at the time of the murders, and that Petitioner's use of drugs and alcohol

19    significantly contributed to his conduct.  (Ex. 23 at 5.)  He also identified seven mitigating

20    factors, on the basis of which he recommended against an aggravated sentence. (*Id.* at 5-6;

21    RT 12/8/93 at 73.)

22         The record developed since Dr. Potts's report has added detail but also ambiguity to

23    the diagnoses Dr. Potts offered in mitigation.  Dr. Potts's report, unchallenged by other

24    expert testimony at sentencing, found that Petitioner suffered from substance abuse and that

25    there was a "likelihood that he suffers from a major mental illness – cyclothymia." (Ex. 23

26    at 5.) The report also noted many of the issues which arose during these habeas proceedings,

27    including the genetic factor underlying Petitioner's substance abuse and mood disorder and

28

the likelihood that Petitioner's drug and alcohol use represented an attempt at self-medication.  (*Id.* at 4.)  Similarly, Dr. Potts's report placed substantial emphasis on Petitioner's head injuries; although Dr. Potts spoke of the head trauma merely as "increas[ing] the potential for neurologic sequelae contributing to [Petitioner's] behavior" (*id.* at 6), the Court has not been presented with evidence confirming that Petitioner suffers from neurological damage caused by head trauma or other factors.  Therefore, Dr. Potts's finding at sentencing remains the most persuasive statement in the record that neurological damage constituted a mitigating factor.  In addition, the diagnoses not specified in Dr. Potts's report, PTSD and ADHD, are the conditions about which the parties' experts were unable to agree; and, with respect to ADHD, even a finding that Petitioner suffers from a residual form of the condition is a fact of little or no mitigating value, because, as Dr. Scialli testified, it bears no causal relationship to violent conduct.

    For the reasons set forth above, Petitioner is not entitled to relief on Claim 20(O).

**2.    Claim 20(P)**

    The PCR court's decision denying this claim – alleging a failure to timely seek neurological or neuropsychological testing – was not objectively unreasonable under *Strickland*.

    ***Neurological testing***

    As Respondents note, Petitioner cannot show that he was prejudiced by counsel's failure to make a timely request for neurological, as opposed to neuropsychological, testing. Petitioner has presented no evidence that neurological tests such as a CAT scan, MRI, or EEG have been performed, let alone that their results would support a finding of cognitive impairment.[12]   Petitioner cannot, therefore, demonstrate that he was prejudiced by trial counsel's failure to secure such testing.

---

    [12]    Petitioner's body apparently contains metallic "pellets" which prevent him from being subjected to an MRI test.  (RT 3/23/06 at 380.)  However, other brain-imaging processes are available.  (*Id.* at 383.)

1   *Neuropsychological testing*

2       As discussed above, the results of neuropsychological tests presented by the parties

3   are largely ambiguous and inconclusive.  They do not demonstrate that Petitioner suffered

4   from cognitive impairment or PTSD at the time of the murders.  Because the results of

5   neuropsychological tests actually performed do not support these diagnoses, Petitioner cannot

6   demonstrate that he was prejudiced by counsel's failure to seek neuropsychological testing.

7       In addition, while this Court has found that Petitioner suffers from a residual type of

8   ADHD and a low-level mood disorder, these conditions do not constitute persuasive evidence

9   in mitigation because they do not bear a relationship to Petitioner's violent behavior.  As the

10  Supreme Court has directed, the sentencer in a capital proceeding must consider all relevant

11  mitigation evidence.  *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S.

12  104 (1982).   Therefore, if Petitioner had presented the trial court with evidence that he

13  suffered from ADHD and a low-level mood disorder, the court would have been obligated

14  to consider such information, whether or not Petitioner could establish a connection between

15  the conditions and his crimes.  *Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *State v. Newell*,

16  212 Ariz. 389, 132 P.3d 833, 849 (2006) ("We do not require a nexus between the mitigating

17  factors and the crime to be established before we consider the mitigation evidence.").

18  However, the court would have been "free to assess how much weight to assign to such

19  evidence."  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-

20  15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence").

21  In "assessing the quality and strength" of Petitioner's mitigation evidence, therefore, the trial

22  court could have taken into account Petitioner's "failure to establish a causal connection"

23  between the murders and his ADHD and low-level mood disorder.  *Newell*, 212 Ariz. at 389,

24  132 P.3d at 849.  This Court concludes that the trial court would have assigned minimal

25  significance to testimony indicating that Petitioner suffered from ADHD and a low-level

26  mood disorder, and that this weight would not have outbalanced the factors found in

27

28

1    aggravation.

2         Novak's failure to seek testing that could have revealed conditions causally unrelated

3    to the crimes did not prejudice Petitioner.  Therefore, Petitioner is not entitled to relief on

4    Claim 20(P).

5    **3.     Claim 20(T)**

6         The PCR court's decision denying this claim was not objectively unreasonable under

7    *Strickland*.  This claim consists of Petitioner's allegation that he was prejudiced by Novak's

8    failure to present additional lay witnesses to support his case in mitigation.  According to

9    Petitioner, such witnesses could have "substantiate[d] claimed mitigation based on

10   Petitioner's traumatic birth, abusive early childhood, history of drug abuse, head injuries and

11   the effects thereof on his behavior."  (Dkt. 54 at 129.)  The information "could have been

12   established through Petitioner's ex-wife, friends, family members, and former drug

13   counselors."[13]  (*Id.*)  Petitioner also alleges that he was prejudiced by Novak's failure to

14   obtain additional birth, school, military, and prison records.  (*Id.*; Dkt. 218 at 23.)

15        At the sentencing hearing, Novak presented the testimony of Randy Jones, who

16   related the circumstances of Petitioner's traumatic birth; his abusive early childhood; his

17   history of drug abuse and drug treatment, including his introduction to drugs by his

18   grandfather; his history of head injuries; and the apparent effect of the drugs and head

19   injuries on his behavior.  (RT 12/8/93 at 39-68.)  Novak admitted records from the Washoe

20   Medical Center where Petitioner was treated for drug withdrawal in 1986 and evaluated after

21   a suicide attempt in 1987 (RT 3/21/06 at 144; Ex. 64); he also admitted records from the

22   military hospital relating to the 1983 "mugging" (RT 12/9/93 at 6-7; Ex. 65). Novak obtained

23   additional records which he provided to Dr. Potts but did not present at sentencing because

24

25

_____

26        [13]    At the evidentiary hearing, counsel for Petitioner indicated that Petitioner was
     not asserting a claim that trial counsel was ineffective for failing to call for testimony from
27   Petitioner's mother at sentencing.  (RT 3/23/06 at 531.)

28

the information in them "could cut both ways as far as mitigation goes." (RT 3/21/06 at 145.) These records include a letter from a drug treatment program stating that Petitioner was discharged for "noncompliance with a very hostile, angry, and threatening attitude toward staff." (Ex. 25; RT 3/21/06 at 147.) Novak chose not to admit additional military records which described the details of Petitioner's bad conduct discharge from the Marines. (RT 3/21/03 at 145.) Novak did not obtain school records, but elicited testimony from Randy Jones indicating that Petitioner's grades declined when he reached adolescence. (*Id.* at 145; RT 12/8/93 at 51-52.)

At the evidentiary hearing before the PCR court, both Randy Jones and Petitioner's mother testified in support of Petitioner's IAC claims. (RT 4/4/00 at 7-38.) Mrs. Jones provided additional details of the abuse she and Petitioner suffered at the hands of Petitioner's father and first step-father. (*Id.* at 29-32, 36.) She testified that Petitioner's grades began to decline at age fifteen or sixteen. (*Id.* at 33.) She also testified that Petitioner's grandfather got him hooked on drugs. (*Id.* at 32.) PCR counsel also presented Petitioner's eighth-grade school records. (ROA-PCR 45, Ex. L.)

Among the new mitigation information Petitioner has offered during the habeas proceedings are allegations that he was abused, emotionally and physically, by Randy Jones and that he was sexually molested by his grandfather. The information detailing the sexual abuse appears for the first time in Dr. Foy's 2002 report (Ex. 5), which Dr. Stewart relied on in his declaration and testimony (Ex. 1; RT 3/22/06 at 234-35).[14] Information concerning

---

[14] Although the Court's analysis relies on the prejudice prong of *Strickland*, with respect to information concerning sexual abuse by Petitioner's grandfather and physical abuse by Randy Jones, the Court additionally finds that Novak did not perform deficiently by failing to uncover information not shared by Petitioner until nearly ten years after his trial. Novak was never put on notice that sexual abuse was an issue. *See Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (counsel's failure to uncover defendant's alleged family history of mental illness was not unreasonable because none of the family members interviewed reported the occurrence of such illness).

1  physical abuse by Randy Jones also appears in Dr. Foy's report and in an affidavit from

2  Petitioner's sister.  (Ex. 13.)

3       Although Petitioner alleges that trial counsel performed deficiently by failing to offer

4  testimony of witnesses to corroborate this abuse, at the evidentiary hearing before this Court,

5  Petitioner did not present the testimony of any of the witnesses cited in his petition; nor, with

6  the exception of the affidavit from his sister, did Petitioner indicate what mitigation

7  information could have been offered by his ex-wife, friends, family members, and former

8  drug counselors.  Petitioner did not testify at the hearing, although his self-report of the

9  sexual abuse is presumably the basis for the information contained in the reports of Drs. Foy

10 and Stewart.  (RT 3/22/06 at 234-35.)

11      The Court cannot conclude that Petitioner was prejudiced by the failure of Novak to

12 call witnesses the contents and credibility of whose testimony is unknown.  The Court further

13 observes that the sentencing judge would likely have viewed with skepticism Petitioner's

14 more-recent allegations of sexual and physical abuse, given their late disclosure, their

15 inconsistency with other information in the record, and Petitioner's "obvious motive to

16 fabricate."  *State v. Medrano*, 185 Ariz. 192, 194, 914 P.2d 225, 227 (1996) (defendant's

17 "self-serving testimony is subject to skepticism and may be deemed insufficient to establish

18 mitigation"); *see State v. Sharp*, 193 Ariz. 414, 425, 973 P.2d 1171, 1182 (1999) (self-

19 reported, uncorroborated evidence "may be given little or no mitigation weight").  Also

20 reducing the import the sentencing judge might have assigned to such information is the lack

21 of a causal connection between the crimes  and the new allegations of abuse.  *See Sharp*, 193

22 Ariz. at 425, 973 P.2d at 1182 (explaining, in case involving a defendant who claimed that

23 he had been regularly sodomized by his stepbrother over a period of eight years, that Arizona

24 courts "require a causal connection to justify considering evidence of a defendant's

25 background as a mitigating circumstance") (citing *Jones*, 185 Ariz. at 490-91, 917 P.2d at

26 219-20).  As noted above, in diagnosing Petitioner with PTSD, Petitioner's experts attempted

27

28

to link his childhood physical and sexual abuse with his conduct while committing the murders.  However, the experts failed to extend their diagnoses beyond a finding that Petitioner experienced traumatic events in his childhood, and therefore did not establish a nexus between the abuse and the murders.

With respect to records not previously obtained and presented at the state-court level, the Court agrees with Respondents that the records accumulated during these habeas proceedings – Petitioner's school records from first grade, medical and military records – are largely cumulative and of little mitigating value.  Petitioner speculates that additional school records, drug-treatment and mental-health records, and accident reports might have been available at the time of Petitioner's trial, but such speculation, as to both the existence and the favorable contents of such records, is not sufficient to affirmatively establish prejudice. Moreover, to the extent that the information contained in unavailable records might address Petitioner's claims of cognitive impairment or other mental conditions, the results of the neuropsychological tests performed during the habeas proceedings constitute a more accurate and meaningful measure of Petitioner's functioning and thereby render such records superfluous.

For the reasons set forth above, Petitioner is not entitled to relief on Claim 20(T).

Accordingly,

**IT IS ORDERED** dismissing Claims 20(O), 20(P), and 20(T) with prejudice.

DATED this 29th day of August, 2006.


_____
Susan R. Bolton
United States District Judge

- 37 -